**Opinion issued June 12, 2014**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-01091-CV

————————————

**THE CITY OF HOUSTON, Appellant**

**V.**

**DOWNSTREAM ENVIRONMENTAL, L.L.C., Appellee**

—————————————————————————

**On Appeal from the 295th District Court**
**Harris County, Texas**
**Trial Court Case No. 2011-29293**

—————————————————————————

## OPINION ON REHEARING

This is an interlocutory appeal from the trial court's order denying the City of Houston's plea to the jurisdiction. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8) (West Supp. 2012). Downstream Environmental, L.L.C. sued the

City for damages that allegedly arose when the discharge line between Downstream's liquid waste disposal facility and the City's sewer system was temporarily closed. The lawsuit also implicates rate increases and a billing dispute that occurred after the temporary closure of the discharge valve. In addition to seeking damages, Downstream seeks equitable and injunctive relief pursuant to its claims under the Texas Bill of Rights.

On April 13, 2014, we issued an original opinion in this case. On May 19, 2014, Downstream filed a motion for rehearing. We deny the motion for rehearing, but withdraw our opinion and judgment of April 13, 2014, and issue this opinion in its stead. The disposition remains unchanged: we reverse the trial court's order in part, and we hold that the City is immune from Downstream's claims for money damages arising from breach of contract, negligence, and alleged constitutional violations. We remand the case to the trial court to allow the remaining requests for injunctive relief based on constitutional claims to proceed.

## Background

Downstream Environmental, LLC is a liquid waste disposal business that operates a nonhazardous waste treatment plant in west Houston. It operates in accordance with an industrial waste permit issued by the City of Houston Department of Public Works and Engineering. This permit allows Downstream to discharge into the City's sanitary sewer system liquid wastes that comply with

2

limitations on the type and concentration of certain pollutants. These wastes are then processed at the City's Beltway wastewater treatment plant.

On the afternoon of May 25, 2010, a truck from G.I. Environmental Vacuum Service, a waste transportation company, entered Downstream's facility. After off-loading a few hundred gallons of waste, a Downstream employee noticed that it was darker than usual and had a foul odor, described as one of "rotting onions" or an "industrial type odor." Approximately 1,000 to 2,000 gallons of non-conforming waste was off-loaded into Downstream's facility that day before employees rejected the remainder of the truck's contents. The next day, the same G.I. Environmental driver delivered a second load of non-conforming waste. Downstream accepted no more than 1,000 gallons of non-conforming waste before the truck and its contents were again rejected.

Meanwhile, on the evening of May 25, the City of Houston Health Department received complaints of an offensive odor near the Beltway wastewater treatment plant. The next morning, the City began investigating the source of the odor, and employees at the Beltway Wastewater Laboratory, which is located on the same site as the Beltway wastewater treatment plant, were told to vacate the building due to a pervasive and offensive odor. The then-unknown toxic substance in the City's sanitary sewer system killed all of the biological treatment microorganisms at the wastewater treatment plant. Without these microorganisms,

the plant cannot function, and death of the microorganisms created an emergency situation for the City and required the sewer lines and lift stations to be decontaminated and the plant to be re-seeded.

On May 26, 2010, Dan Noyes, one of Downstream's owners, met with the City regarding the non-conforming waste. The City closed the discharge line between Downstream's facility and the City's sanitary sewer. The parties disagree about whether this action was undertaken voluntarily by Downstream to help identify a third party responsible for putting non-conforming waste into the sewer system by way of a manhole just outside Downstream's property or whether the City unilaterally plugged the discharge line in response to Downstream's acceptance of non-conforming waste. The City directed Downstream to conduct a hazardous materials sweep, which revealed no hazardous materials at its facility.

Nevertheless, the facility remained closed for 21 days while the City investigated. While Downstream was shut down, the City decided to permanently discontinue wastewater services to the facility. Downstream requested an administrative hearing as authorized by the Houston municipal code. *See* CODE OF ORDINANCES: CITY OF HOUSTON, TEX. § 47-208(a) (Supp. 2013). The administrative judge ruled in favor of Downstream, and the City restored wastewater services the next day. By the time Downstream restarted its operations, waste had solidified in its equipment leading to what it characterized as

4

"catastrophic" failures. Downstream conducted extensive cleaning and replacement of component parts; however, it lost some of its business to a competitor.

In September 2011, the City informed Downstream that it would begin using a new sample location, a manhole outside of Downstream's property, to determine compliance with pollutant discharge limitations. In October 2011, the City increased Downstream's per-gallon cost of discharging wastewater by approximately 700%, which Downstream contends effectively put it out of business. In April 2012 the City reduced that cost, however even the reduced rate was 300% higher than the cost to Downstream before October 2011. Downstream alleged that the City acted improperly by using faulty testing methods and a non-credentialed in-house laboratory. It requested retesting by a credentialed external laboratory, and the City refused.

Downstream then sued the City for various causes of action pertaining to the plugging of the discharge line in the spring of 2010, the increase in its wastewater rates, and the discharge-sampling decisions. In its third amended petition, Downstream alleged the following causes of action: (1) "due process" violations in wrongfully terminating wastewater services and in wrongfully increasing the rates; (2) "equal protection" violations in denying administrative hearings when

5

requested and in failing to lower the charged rate upon proof from an external laboratory; (3) breach of contract; and (4) negligence.

Downstream generally pleaded for monetary damages for loss of sales revenue, costs of plant repairs and hazardous materials clean-up, loss of good will, loss of market share, loss of the market value of the company, attorneys' fees, pre- and post-judgment interest, and costs as allowed by law. With respect to its "due process" and "equal protection" claims,[1] Downstream also sought injunctive relief against future constitutional violations and the voiding of the City's "administrative actions regarding rate increases and frivolous violations."

The City filed a plea to the jurisdiction based on governmental immunity. Downstream challenged the City's assertion of immunity primarily on the basis that the City was engaged in a proprietary—not governmental—function. Downstream also alleged that the City had waived governmental immunity by its actions in several respects. The trial court denied the jurisdictional plea in its entirety, and the City timely appealed.

---

[1]   Despite the use of this terminology, Downstream's petition is expressly and exclusively premised on provisions of the Texas Bill of Rights which prohibit the deprivation of "life, liberty, property, privileges or immunities," or any manner of disenfranchisement, "except by the due course of the law of the land," TEX. CONST. art. I, § 19, and further provide that "[a]ll free men . . . have equal rights," *id*. art. I, § 3.

**Analysis**

The City contends that the trial court erred by denying its plea to the jurisdiction because it is immune from suit for several reasons: (1) the operation of the sanitary sewer system is a governmental function; (2) injunctive relief and money damages are both unavailable on the "due process" claims; (3) the "equal protection" claim is facially invalid; (4) there is no allegation of a contract subject to the limited waiver of immunity under Local Government Code section 271; and (5) the City retains immunity from intentional tort claims even if pleaded as negligence. Downstream's response centers on its contention that the City engaged in a proprietary function by providing the industrial waste permits, and therefore it is simply not immune from suit. To this end, Downstream argues that the City was engaged in a proprietary function because it was functioning as a "public utility provider," and the Tort Claims Act provides that the operation and maintenance of a public utility is a proprietary function. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(b) (West Supp. 2013).

## I.  Governmental immunity as jurisdictional bar

A plea to the jurisdiction based on governmental immunity questions a trial court's subject-matter jurisdiction. *State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004). We review de novo the trial court's ruling on a plea to the jurisdiction. *City*

7

*of Houston v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2013) (per curiam). The plaintiff must allege facts that affirmatively establish the trial court's subject matter jurisdiction. *Holland*, 221 S.W.3d at 642. In determining whether the plaintiff has satisfied this burden, we construe the pleadings liberally in the plaintiff's favor and deny the plea if facts affirmatively demonstrating jurisdiction have been alleged. *Miranda*, 133 S.W.3d at 227; *Smith v. Galveston Cnty.*, 326 S.W.3d 695, 697–98 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

A plea to the jurisdiction may challenge the existence of jurisdictional facts. *Miranda*, 133 S.W.3d at 227. In some cases, the challenged jurisdictional facts are distinct from the merits of the case, but in other cases the challenged jurisdictional facts are inextricably linked to the merits of the case. *Id.* "[I]n a case in which the jurisdictional challenge implicates the merits of the plaintiffs' cause of action and the plea to the jurisdiction includes evidence, the trial court reviews the relevant evidence to determine if a fact issue exists." *Id.* The standard of review on appeal "generally mirrors that of a summary judgment," and the court of appeals will take as true all evidence favorable to the nonmovant and indulge reasonable inferences and resolve doubts in the nonmovant's favor. *Id.* at 228.

If "the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiffs should be

8

afforded the opportunity to amend." *Id.* at 226–27. A court may grant a plea to the jurisdiction without affording the plaintiff an opportunity to amend only if "the pleadings affirmatively negate the existence of jurisdiction." *Id.* at 227. "A trial court is not required to deny an otherwise meritorious plea to the jurisdiction or a motion for summary judgment based on a jurisdictional challenge concerning some claims because the trial court has jurisdiction over other claims." *Thomas v. Long*, 207 S.W.3d 334, 339 (Tex. 2006).

"Sovereign immunity and its counterpart, governmental immunity, exist to protect the State and its political subdivisions from lawsuits and liability for money damages." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655 (Tex. 2008). While sovereign immunity protects the State, its agencies, and their officers, governmental immunity protects subdivisions of the State, such as municipalities. *Id.* at 655 n.2 (citing *Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004)). Both sovereign and governmental immunity "afford the same degree of protection and both levels of government are subject to the Tort Claims Act." *Id.*; *see* TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.001–.109; *Sykes*, 136 S.W.3d at 638.

Governmental immunity includes both immunity from suit, which deprives a court of subject-matter jurisdiction, and immunity from liability, which is an affirmative defense. *See Miranda*, 133 S.W.3d at 224. "Immunity from suit bars a suit against the State unless the Legislature expressly consents to the suit." *Tex.*

9

*Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 853 (Tex. 2002). "If the Legislature has not expressly waived immunity from suit, the State retains such immunity even if its liability is not disputed." *Id.* "Immunity from liability protects the State from money judgments even if the Legislature has expressly given consent to sue." *Id.*

## II. Immunity from contract and tort claims

Downstream has asserted a variety of theories of breach of contract as well as negligence claims against the City. We will analyze these claims for money damages together to determine whether the City has validly asserted a claim of immunity from such claims.

### A. Proprietary-governmental function dichotomy

In determining whether a governmental entity is immune from suit, we consider whether the actions complained of were in furtherance of governmental or proprietary functions. *See Tooke v. City of Mexia*, 197 S.W.3d 325, 343 (Tex. 2006). "[G]enerally speaking, a municipality's proprietary functions are those conducted 'in its private capacity, for the benefit only of those within its corporate limits, and not as an arm of the government,' while its governmental functions are 'in the performance of purely governmental matters solely for the public benefit.'" *Id*. (quoting *Dilley v. City of Houston*, 222 S.W.2d 992, 993 (Tex. 1949)). "A municipality is not immune from suit for torts committed in the performance of its

10

proprietary functions as it is for torts committed in the performance of its governmental functions." *Id.* And although the Supreme Court of Texas has never held that the same distinction applies to contracts, even if the City were not immune from contract claims involving proprietary functions, a legislative determination for purposes of tort liability that a certain activity is a governmental function excludes contracts involving that governmental function from the scope of waiver applicable to proprietary functions, in the absence of some reason why the common-law classification would be different. *Id.* at 343–44.

"The Texas Constitution authorizes the Legislature to 'define for all purposes those functions of a municipality that are to be considered governmental and those that are proprietary, including reclassifying a function's classification assigned under prior statute or common law.'" *Id.* at 343 (quoting TEX. CONST. art. XI, § 13); *see also City of Tyler v. Likes*, 962 S.W.2d 489, 503 (Tex. 1997). The Legislature has described governmental functions as "those functions that are enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public." TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a). The Legislature has statutorily recognized a non-exclusive list of 36 governmental functions. *Id.* The Legislature also defined proprietary functions as "those functions that a municipality may, in its discretion, perform in the interest of the inhabitants of the

11

municipality," and the statute sets forth a non-exclusive list of three proprietary functions. *Id.* §101.0215(b). Finally, the Legislature specified that the "proprietary functions of a municipality do not include those governmental activities listed under subsection (a)." *Id.* § 101.0215(c). Accordingly, we have no discretion to determine that a municipality's action is proprietary if it has been designated as a governmental function by the Tort Claims Act. *See City of Texas City v. Suarez*, No. 01-12-00848-CV, 2013 WL 867428, at *7 (Tex. App.—Houston [1st Dist.] Mar. 7, 2013, pet. filed) (mem. op); *accord City of Plano v. Homoky*, 294 S.W.3d 809, 814 (Tex. App.—Dallas 2009, no pet.); *Tex. River Barges v. City of San Antonio*, 21 S.W.3d 347, 357 (Tex. App.—San Antonio 2000, pet. denied).

Downstream's claims are based on its contention that in the spring of 2010 the City plugged the wastewater discharge line between Downstream's facility and the City's sanitary sewer system. The statutory list of governmental functions includes "sanitary and storm sewers." TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a)(9). Downstream nevertheless argues that the industrial wastewater services at issue in this case differ from sanitary sewer service and that the City's actions are proprietary because (1) the City has discretion in permitting a significant industrial user to discharge treated wastewater into its sanitary sewer system, (2) the City profits from this service, and (3) the service primarily benefits a party within the City's limits rather than the general public.

12

To support its argument that this particular action is a proprietary function not "arising from" its governmental function of operating a sanitary sewer system, *id.*, Downstream relies on *Parker v. Distel Construction, Inc.*, No. 10CA18, 2011 WL 4346670 (Ohio App. 4th Sept. 6, 2011), an unpublished Ohio court of appeals case. Parker sued a city in tort for injuries sustained when she fell into a 25-inch hole adjacent to a water meter, which was part of the city's water supply system. *Parker*, 2011 WL 4346670, at *1. Although the key issue was whether the city had engaged in proprietary or governmental activities, *Parker* is distinguishable because, unlike the Texas Tort Claims Act, the relevant Ohio statute specifically defined the "establishment, maintenance, and operation of a utility, including . . . a municipal corporation water supply system" as a "proprietary function." *Id.* at *3 (citing OHIO REV. CODE ANN. § 2744.01 (West 2012)). Unlike the Texas statute, the Ohio statute also defines the "maintenance, destruction, operation, and upkeep of a sewer system" as a "proprietary function." OHIO REV. CODE ANN. § 2744.01.

Downstream also relies on *Josephine E. Abercrombie Interests, Inc. v. City of Houston*, 830 S.W.2d 305 (Tex. App.—Corpus Christi 1992, writ denied), and *City of Houston v. Southwest Concrete Construction, Inc.*, 835 S.W.2d 728 (Tex. App.—Houston [14th Dist.] 1992, writ denied), as examples in which an appellate court determined that a city's actions were proprietary and not governmental. However, those cases are not controlling; both of them have been acknowledged

13

by our court as having been abrogated by a subsequent amendment to the Tort Claims Act. *See E. Hous. Estate Apts., L.L.C. v. City of Houston*, 294 S.W.3d 723, 732–33 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a)(34)).

The Tort Claims Act classifies "health and sanitation services," "sanitary and storm sewers," and "water and sewer service" as governmental functions. TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a)(2), (9), (32). The line that was plugged was the connection between Downstream's facility and the City's sanitary sewer. Thus, Downstream's claims arise from the City's governmental functions of providing and operating "sanitary . . . sewers" and "sewer service."

Downstream also contends that this case is governed by the "service within a service" rule which creates liability for a city that adds discretionary services to its normal governmental functions. *See Temple v. City of Houston*, 189 S.W.3d 816, 818–21 (Tex. App.—Houston [1st Dist.] 2006, no pet.). It argues that services that merely touch upon governmental services do not transform a proprietary function into a governmental function. *See City of Corpus Christi v. Absolute Indus.*, 120 S.W.3d 1, 4 (Tex. App.—Corpus Christi 2001, pet. denied).

A similar argument was rejected in *Tooke v. City of Mexia*, 197 S.W.3d 325 (Tex. 2006), in which J. E. Tooke & Sons contracted with Mexia to furnish labor and equipment for collecting brush and leaves curbside within the city. 197 S.W.3d

14

at 329. When Tooke sued Mexia for breach of contract, the city asserted immunity, but the trial court denied the jurisdictional plea. *Id.* at 330. Among other arguments, the Supreme Court considered the governmental-proprietary dichotomy. *Id.* at 343. It noted that the Tort Claims Act included among a municipality's governmental functions "garbage and solid waste removal, collection, and disposal," and it reasoned, "[w]e think this describes the services the Tookes agreed to provide." *Id.* at 343–44. Thus the Supreme Court rejected the Tookes' argument that the claim implicated proprietary functions when the activity was indistinguishable from a governmental function.

Likewise, other courts of appeals have held that "governmental functions encompass activities that are closely related to or necessary for performance of the governmental activities designated by statute." *City of Houston v. Petroleum Traders Corp.*, 261 S.W.3d 350, 356 (Tex. App.—Houston [14th Dist.] 2008, no pet.). For example, in *Ethio Express Shuttle Service, Inc. v. City of Houston*, 164 S.W.3d 751 (Tex. App.—Houston [14th Dist.] 2005, no pet.), Ethio Express sued Houston over a dispute about a permit to operate an airport-shuttle service within the city limits. 164 S.W.3d at 753. The Fourteenth Court of Appeals observed that the Tort Claims Act lists airports, regulation of traffic, and transportation systems as governmental functions, and it held that Houston's regulation of airport-shuttle services was a governmental function because "Ethio is a transportation system

transporting travelers to [Houston's] airports and [Houston] regulates its business." *Id.* at 756. The court added, "We would be remiss to hold that the City's activities are proprietary in a case in which they are so well aligned with the functions the Legislature has designated as governmental." *Id.*; *see also City of San Antonio v. Butler*, 131 S.W.3d 170, 177–78 (Tex. App.—San Antonio 2004, pet. denied); *Tex. River Barges*, 21 S.W.3d at 356–57.

In this case, the line that was plugged by the City connected Downstream's facility directly to the City's sanitary sewer system. In his affidavit Walid Samarneh, a professional engineer who works as the managing engineer of the City's Public Works and Engineering Department, Wastewater Operations, explained that the release of an unknown toxic substance contaminated the sewer lines and killed all the biological treatment microorganisms. Samarneh averred that this "created an emergency situation for the City" which required corrective measures:

> The microorganisms are a necessary component of the wastewater treatment process and without them the Beltway Plant could not function properly or meet its TPDES effluent permit limits. The plant had to be re-seeded with new microorganisms. The sewer lines and lift stations also had to be decontaminated so that they did not re-damage the Beltway Plant.

The record contains conflicting evidence as to whether Downstream was involuntarily shut down by the City, or whether it instead voluntarily capped the

16

discharge line to prove that it was not the source of the nonconforming discharge. On rehearing, Downstream contends that there was no evidence that it was necessary for the City to close its discharge line. This argument misses the point. The record shows that the investigation and closure of the discharge line—whether accomplished voluntarily by Downstream or required by the City—were part and parcel of the City's emergency actions to return its sanitary sewer system to operational status. This does more than touch upon a governmental service because these actions are intertwined with a function that the Legislature has determined to be governmental, i.e., sanitary sewer services. *See Ethio Express Shuttle Svc.*, 164 S.W.3d at 756; *Absolute Indus.*, 120 S.W.3d at 4. Whether the investigation eventually determined that Downstream was the culprit has no bearing on the question of whether the City's actions were governmental or proprietary. The service the City provided to Downstream was sanitary sewer service to the extent that all the wastewater went through the same sanitary sewer lines to the City's publicly owned treatment works.

Similarly, the City's issuance of permits to discharge industrial wastewater did not constitute the undertaking of a proprietary function. Rather, that process established the conditions under which Downstream and others are allowed to use the sanitary sewer system—the operation and maintenance of which is a governmental function—for industrial wastes. The City's challenged activities do

17

more than "touch upon" sanitary sewers and sewer services: they are in fact the very same thing. This case does not involve a "service within a service"; it is a case involving a service that the Legislature has already determined to be a governmental function. Accordingly, we hold that the City's actions in plugging the discharge line between Downstream's facility and the City's sewer system involved a governmental function for which the City has immunity.

Downstream further argues at length that the City's actions with regard to permitting the discharge of industrial waste and the operation of the sewer system and wastewater treatment plant constitute the operation and maintenance of a public utility. Downstream thus contends that the City was engaged in a proprietary function because it was functioning as a "public utility provider," and the Tort Claims Act provides that the operation and maintenance of a public utility is a proprietary function. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(b). We need not, however, separately analyze whether the City's services at issue in this case can be classified as a proprietary "public utility" function, because the Tort Claims Act expressly forecloses the possibility of conflict between the statutorily defined governmental and proprietary functions. It specifies that "[t]he proprietary functions of a municipality do not include those governmental activities listed under Subsection (a)." *Id*. § 101.0215(c). Since we have concluded that the actions at issue in this case arise from the operation of a sanitary sewer,

18

constituting a governmental function under section 101.0215(a), we need not further consider whether it could also or alternatively be considered a public utility under section 101.0215(b). Under the plain language of section 101.0215(c), it cannot. *See id.*

## B. Waiver of immunity

Finally, even when we have determined that a municipality's action giving rise to a claim was governmental in nature, we still must consider whether immunity nevertheless has been waived. *See, e.g.*, *Tooke*, 197 S.W.3d at 344; *McDonald v. City of the Colony*, No. 02-08-263-CV, 2009 WL 1815648, at *5 (Tex. App.—Fort Worth June 25, 2009, no pet.) (mem. op.). Express consent by the Legislature is ordinarily necessary to waive governmental immunity. *Tooke*, 197 S.W.3d at 332–33; *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999). Such a waiver of immunity must be clear and unambiguous. *Tooke*, 197 S.W.3d at 333.

In the trial court, Downtream argued that the City had waived governmental immunity in several ways apart from allegedly engaging in a proprietary function. Downstream argued that the City waived immunity from suit by "bringing claims against [it] for a disputed $286,296.40 wastewater bill and filing notice of lien on real property" for the same amount. But Downstream's claims in this appeal are not actually counterclaims filed in response to a suit initiated by the City; rather

19

Downstream initiated the suit as a plaintiff asserting various causes of action against the City. The Supreme Court has held that the Local Government Code, by providing that a "municipality may plead and be impleaded in any court," *see* TEX. LOC. GOV'T CODE ANN. § 51.075 (West 2008), did not indicate "a clear legislative intent to waive immunity from suit." *Tooke*, 197 S.W.3d at 342. Thus, we conclude there is no merit to Downstream's argument that the City waived immunity merely by seeking to collect a past-due wastewater bill in a separate action.

The Local Government Code also includes an express waiver of immunity from suit for breach of a written contract for provision of goods or services to the local governmental entity or for the "sale or delivery of not less than 1,000 acre-feet of reclaimed water by a local governmental entity intended for industrial use." TEX. LOC. GOV'T CODE ANN. §§ 271.151(2) (West Supp. 2013), 271.152 (West 2005). Downstream has not pleaded the existence of a written contract for the provision of goods or services to the City, and the waiver of immunity in the Local Government Code does not apply to this case.

Finally, in its Second and Third Amended Petitions, Downstream argued that the City waived immunity by actions constituting "duress, coercion, and bullying." The Legislature has granted a limited waiver of governmental immunity in the Tort Claims Act, "allowing suits to be brought against governmental units only in certain, narrowly defined circumstances." *Tex. Dep't of Criminal Justice v.*

*Miller*, 51 S.W.3d 583, 587 (Tex. 2001). These circumstances do not include duress, coercion, bullying, or harassment. Rather, the Tort Claims Act provides that a governmental unit is liable for:

> property damage . . . proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:
>
> > (A) the property damage . . . arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and
> >
> > (B) the employee would be personally liable to the claimant according to Texas law . . . .

TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1) (West 2011). No such allegation appears in Downstream's live pleading, and we conclude that the Legislature has not waived the City's immunity as to Downstream's negligence claim.

Accordingly we find no applicable waiver of the City's immunity as to Downstream's contract and negligence claims for monetary damages, and we hold that the trial court erred by failing to grant the City's plea to the jurisdiction as to those claims.

## III. Constitutional claims

Downstream also alleged "due process" and "equal protection" claims in relation to the termination of services and imposition of rate increases and past-due charges. Downstream's live pleading in the trial court and briefing in this court expressly invoke state constitutional protections.

Invoking Article I, section 19 of the Texas Constitution, the first count of Downstream's live pleading alleged wrongful termination of utilities and a wrongful rate hike "without due process." Section 19 provides that "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." TEX. CONST. art. I, § 19. Downstream alleged that "the City's refusal to provide wastewater disposal utility water services to the property and illegal sampling and testing methods, and illegal rate hikes, are unconstitutional and illegal, and constitutes an arbitrary, capricious, and irrational action by the City." Downstream alleged that it has been overcharged by $286,296.40 and that it has been denied an administrative hearing to address the overcharge. It also alleged the City's failure to abide by its "termination and rate setting laws set out in [the] Houston Code of Ordinances . . . . constitute[d] a violation of [its] rights to notice, hearing, and due process."

Downstream also invoked Article 1, section 3 of the Texas Constitution in support of allegations of an "equal protection" violation for alleged ongoing harassment. Section 3 provides that "All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services." TEX. CONST. art. I, § 3.

22

## A. Injunctive relief

In its petition Downstream sought "equitable relief from the violation of rights to due process." By its pleadings it sought to enjoin the City from denying it "due process" and "equal protection," and to void the City's administrative actions regarding rate increases.

In its live pleading, Downstream complains that the denial of its requests for administrative hearings in regard to billing and related matters violate its "due process" and "equal protection" rights. By alleging that the denial of review violates the City's own ordinances, Downstream has also alleged a deprivation of rights in violation of the due course of the law. *See* TEX. CONST. art. I, § 19. By alleging disparate treatment in the denial of the right to be heard, Downstream has alleged denial of equal rights under the law. *See id.* art. I, § 3.

The Texas Constitution authorizes suits for equitable or injunctive relief for violations of the Texas Bill of Rights. *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 148–49 (1995) (citing TEX. CONST. art. I § 29). But this limited waiver of immunity exists only to the extent the plaintiff has pleaded a viable constitutional claim. *City of Houston v. Johnson*, 353 S.W.3d 499, 504 (Tex. App.—Houston [14th Dist.] 2011, pet. denied).

Texas courts have held that to assert an equal-rights claim under article I, section 3, a claimant must allege that it was treated differently from other similarly

23

situated parties, without a reasonable basis. *See, e.g.*, *City of Dallas v. Jones*, 331 S.W.3d 781, 787 (Tex. App.—Dallas 2010, pet. dism'd). The City asserted immunity from Downstream's equal-rights claim on the basis that it is not supported by the facts. In the trial court, the City argued that because it claimed a rational basis for plugging the discharge line from Downstream's plant to the sewer, the claim was not viable and therefore the court lacked jurisdiction. On appeal the City also argues that the claim is facially invalid because the allegation that Downstream's plant was closed for 27 days pending an investigation does not state a cognizable constitutional claim.

Although the City did not raise the facial invalidity of Downstream's equal-rights claim in its plea to the jurisdiction, we address it because jurisdictional arguments may be raised for the first time on appeal. *See, e.g.*, *Rhule*, 417 S.W.3d at 442; *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 94 (Tex. 2012). In so doing, we construe Downstream's pleadings liberally. *See Miranda*, 133 S.W.3d at 226. Downstream alleged that various actions taken by the City were "arbitrary, capricious, and irrational" and constituted harassment, including termination of wastewater services, the issuance of frivolous violations, illegal sampling, non-approved testing of samples, overcharging in the amount of $286,296.40, and serving notice of intent to file a lien. Downstream alleged that the City plugged the discharge line from its plant to the sewer system and kept it plugged despite

24

evidence that other transporters, not Downstream, were responsible for illegally dumping waste into the City's sewer system through a manhole. Similarly, Downstream alleged that after cleaning its plant, the City refused to reopen the discharge line, telling Downstream's owner that the situation had become "political." Downstream alleged that the City's rate hikes were "arbitrary and capricious" and that it had been "singled out . . . with disparate treatment that has no rational basis." As to the sampling, Downstream alleged that it was "the only customer in the City having samples drawn from an off-site location." Downstream alleged that it had been "singled out for maltreatment, bullying, and harassment," and that "[n]o other industrial customer in the City has been treated like Downstream." It alleged that it was the only customer "that has been repeatedly denied Administrative hearings to address over-charging, and has not had the wastewater rate lowered upon demonstrating (by use of an independent lab) that the City's lab scores were wildly erroneous."

Construing its pleading liberally, we conclude that Downstream's allegations of arbitrary, capricious, irrational, and disparate treatment state a constitutional claim based upon an unequal application of the law without any reasonable basis. As such, the equal-rights claims are sufficient to survive a plea to the jurisdiction based solely on the pleadings, and we overrule the City's arguments that such claims are facially invalid.

25

The City also argued that the court lacked jurisdiction because evidence shows that it acted reasonably in plugging Downstream's discharge line. *See Johnson*, 353 S.W.3d at 504. To the extent a rational basis for discriminatory treatment may constitute a defense to Downstream's claims, this argument implicates the merits of the case. Ordinarily a plea to the jurisdiction "should be decided without delving into the merits of the case." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000); *see Miranda*, 133 S.W.3d at 223. Although a court may consider evidence relevant to the jurisdictional issue, "a dilatory plea does not authorize an inquiry so far into the substance of the claims presented that plaintiffs are required to put on their case simply to establish jurisdiction." *Bland Indep. Sch. Dist.*, 34 S.W.3d at 554. Rather, when the jurisdictional challenge implicates the merits of the plaintiff's cause of action, the court reviews relevant evidence to determine if a fact issue exists, in the same manner as a traditional motion for summary judgment. *Miranda*, 133 S.W.3d at 227–28. Like a traditional motion for summary judgment, a party asserting a plea to the jurisdiction must conclusively negate a jurisdictional fact before the burden shifts to the nonmovant to present evidence raising a question of fact. *See id.*; *Tex. S. Univ. v. Gilford*, 277 S.W.3d 65, 70 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

The City argued in the trial court, as it does on appeal, that the facts do not support the equal-rights claim because there was no dispute that its facility had

been contaminated, that it acted reasonably in plugging the line from Downstream to the sewer, and this action was rationally related to the legitimate governmental function of providing sewer service. While this evidence may establish the reasonableness of initially closing the discharge line between Downstream's facility and the City's sewer,[2] none of it conclusively proves that the City had a rational basis for keeping the line closed for 27 days. Nor does it address Downstream's other separate allegations of unequal treatment with respect to sampling, testing, or rate increases. We therefore conclude that the City did not conclusively negate the viability of Downstream's equal-rights claims, and we hold that the trial court did not err by denying the City's plea to the jurisdiction as to such claims.

As to the due-course-of-law claim, which includes the complaint that Downstream has been denied administrative hearings, the City contends that the court lacks jurisdiction because Downstream failed to allege a declaratory-judgment action. Specifically, the City argues that a due course of law claim is the wrong procedural vehicle for raising complaints about the City's administrative actions and rate increases. The City further argues that because the Declaratory

---

[2] The City's evidence included Downstream's permit, several affidavits that described the events of May 25 and 26 and immediate need to plug the discharge line, excerpts from a show cause hearing in which one of Downstream's owners said he asked for the line to be "capped," Downstream's answer in a lawsuit filed by G.I. Environmental Vacuum Service, and provisions of the City's municipal code.

Judgments Act provides an express waiver of governmental immunity for declaratory relief but not for monetary damages, *see Gatesco, Inc. Ltd. v. City of Rosenberg*, 312 S.W.3d 140, 144 (Tex. App.—Houston [14th Dist.] 2010, no pet.), Downstream should have raised its claims seeking the voiding of the City's prior administrative action by way of a declaratory-judgment action. To the extent that the City's claim of immunity is reducible to an objection about the procedural device by which Downstream raises its claims, that argument is one of pleading sufficiency and we hold that the trial court did not err in denying the City's plea to the jurisdiction as to such a claim, because, at a minimum, Downstream should be afforded an opportunity to amend and cure the deficiency. *Miranda*, 133 S.W.3d at 226–27.

The City also argues that Downstream's request for injunctive relief is moot to the extent it is premised upon a complaint about the wrongful termination of utilities which have since been restored. However, Downstream's allegations and request for injunctive relief are not limited to the past termination of wastewater services. Rather, Downstream has alleged that unfair treatment by the City is "ongoing," and that the City has "repeatedly denied Administrative hearings" to address the unequal treatment that Downstream claims it has received. Accordingly, Downstream's constitutional allegations are not solely backward-looking, and we conclude that the requests for injunctive relief are not moot.

Finally, the City argues that to the extent Downstream is attempting to raise an inverse condemnation claim, the district court lacked subject matter jurisdiction as a matter of law. "A county civil court at law has exclusive jurisdiction in Harris County of eminent domain proceedings, both statutory and inverse, regardless of the amount in controversy." TEX. GOV'T CODE ANN. § 25.1032(c) (West Supp. 2013). However, Downstream's live pleading at the time the trial court denied the City's plea to the jurisdiction was its Third Amended Petition, and that pleading contained no claim for inverse condemnation. *See Villarreal v. Harris Cnty.*, 226 S.W.3d 537, 542 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("Inverse condemnation occurs when (1) a property owner seeks (2) compensation for (3) property taken for public use (4) without process or a proper condemnation proceeding."). Accordingly, there is no jurisdictional barrier to Downstream proceeding in the district court, because it no longer asserts an inverse condemnation claim.

## B. Claim for money damages

As a remedy for the alleged "due process" violations, Downstream also sought monetary damages "within the jurisdictional limits of this court." The City argues that such damages are legally unavailable, and we agree. There is no implied right of action to recover money damages for violation of the due-course-of-law provision in the Texas Bill of Rights. *See, e.g., Tex. S. Univ. v. Araserve*

*Campus Dining Servs. of Tex., Inc.*, 981 S.W.2d 929, 935 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). Thus we conclude that the trial court erred by denying the City's plea to the jurisdiction as to Downstream's claim for monetary damages on its due-course-of-law cause of action.

## Conclusion

We reverse the order of the trial court in part, hold that the City is immune from all of Downstream's contract and negligence causes of action as well as its claims for monetary relief based on constitutional violations, and we render judgment of dismissal on those claims. We conclude that the jurisdictional plea was correctly denied with respect to constitutional claims for injunctive relief, and we remand for further proceedings on the remainder of the case.

Michael Massengale
Justice

Panel consists of Justices Keyes, Higley, and Massengale.

Justice Keyes, dissenting.