ACCEPTED
15-25-00089-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
8/25/2025 5:39 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-00089-CV

_____

# In the
# Fifteenth Court of Appeals
# Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
8/25/2025 5:39:24 PM
CHRISTOPHER A. PRINE
Clerk

_____

TEXAS DEPARTMENT OF AGRICULTURE, ET AL.,

*Appellants,*

v.

BE A CHAMPION, INC., JAMES HONG, KEVIN KLOTZ,
GEORGE MOON, AND JARON BARGAINER,

*Appellees.*

_____

On Appeal from the 53rd Judicial Court,
Travis County, Texas (No. D-1-GN-24-000305)
The Honorable Jessica Mangrum, Presiding

_____

**APPELLEES' BRIEF ON THE MERITS**

_____

Kevin J. Terrazas
State Bar No. 24060708
kterrazas@terrazaspllc.com
Benjamin L. Dower
State Bar No. 24082931
Jennifer A. Foster
State Bar No. 24104938
TERRAZAS PLLC
1001 S. Capital of Texas Hwy, L250
Austin, Texas 78746
512.680.3257
COUNSEL FOR APPELLEES

## IDENTITY OF PARTIES AND COUNSEL

| | |
|---|---|
| **Be a Champion, Inc.; James Hong; Kevin Klotz; George Moon; and Jaron Bargainer** | **Appellees/Plaintiffs** |

Kevin J. Terrazas
Benjamin L. Dower
Jennifer A. Foster
TERRAZAS PLLC
1001 S. Capital of Texas Hwy
Building L, Suite 250
Austin, Texas 78746
512-680-3257
kterrazas@terrazaspllc.com
bdower@terrazaspllc.com
jfoster@terrazaspllc.com

Trial and Appellate Counsel


**The Texas Department of Agriculture ("TDA"); Sid Miller, in his official capacity as TDA Commissioner; Terry Keel, in his official capacity as TDA Deputy Commissioner; Laura Benavidez, individually and in her official capacity as TDA Administrator for Food & Nutrition; Lena Wilson, in her official capacity as TDA Assistant Commissioner for the Food & Nutrition Division; Annette McBride, individually and in her official capacity as TDA Director of Community Operations; Carey Spence Lenss, individually and in her official capacity as TDA Assistant Director of Community Operations for Food and Nutrition;**

**Appellants/Defendants**

**Senta Fortune, individually and in her official capacity as TDA Director of Community Operations for Food and Nutrition; Belia Montelongo, individually and in her official capacity as TDA Senior Administrative Review Specialist; Celia Garcia, individually and in her official capacity as TDA Administrative Review Specialist; Carl Crittendon, individually and in his official capacity as TDA Policy Analyst; and David Dierksen, individually and in his official capacity as TDA Assistant Director for Policy**

Todd Dickerson                          Trial and Appellate Counsel
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capital Station
Austin, Texas 78711-2548
737-228-7289
todd.dickerson@oag.texas.gov

# TABLE OF CONTENTS

Identity of Parties and Counsel ....................................................................ii

Table of Contents .........................................................................................iv

Table of Authorities....................................................................................vii

Statement of the Case ................................................................................xiii

Statement Regarding Oral Argument .........................................................xv

Statement of Issues Presented....................................................................xvi

Introduction.................................................................................................. 1

Statement of Facts ........................................................................................ 2

Summary of the Argument ........................................................................... 8

Argument...................................................................................................... 11

    I.    Appellants' Arguments Regarding the *Ultra Vires* Exception and Waiver Under the UDJA Miss the Mark. ................................... 11

        A.    The UDJA's immunity waiver is not at issue........................... 11

        B.    Appellants are not immune from the *ultra vires* claim........... 11

            1.    Appellees do not rely on the *ultra vires* exception for claims against the TDA. ................................................ 12

            2.    Appellees pleadings are facially sufficient to establish Appellants' *ultra vires* acts and to demonstrate a lack of immunity for those acts. ........................................... 12

            3.    Appellees seek logically necessary relief. ........................... 16

            4.    Appellants lack "absolute discretion" to ignore regulations or terminate BAC's CACFP participation without appropriate notice. ....................................... 18

            5.    Appellees have standing to bring an *ultra vires* claim......... 19

II. The Pleadings Plausibly Demonstrate Appellees' Standing to Pursue All of Their Asserted Claims...................................21

III. Appellees' Section 1983 Claims Fall Under *Ex Parte Young.* ...................................................................................24

IV. Appellees Pled Facially Valid Claims.........................................26

    A. Appellees' procedural due-course of law claim based on a property interest is facially valid...............................27

        1. Appellees allege a valid property interest............................27

        2. Appellees' assertion of deficient process is facially valid. ...............................................................32

    B. Appellees' procedural due-course-of-law claim based on a stigma-plus liberty interest is facially valid....................35

    C. Appellees' substantive due-course-of-law claim is facially valid. ..........................................................................38

        1. Appellees allege protected property and liberty interests. .................................................................39

        2. Appellees allege arbitrary conduct. ....................................40

    D. Appellees' equal protection claim is facially valid...................42

        1. Appellees were treated differently in violation of the Equal Protection Clause.............................................42

        2. Appellants had no reasonable basis for their actions. .........45

        3. *Engquist* does not foreclose Appellees' alternatively-pleaded class-of-one equal protection claim..............................47

    E. The redundant remedies doctrine does not bar any of Appellees' otherwise facially-valid claims. .....................48

    F. Appellees' *ultra vires* claim is facially valid. ..........................51

    G. Appellees' takings claim is facially valid................................51

Prayer ..........................................................................................57

# TABLE OF AUTHORITIES

## Cases

*Air Evac EMS, Inc. v. Tex. Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507 (5th Cir. 2017) ................................................................24

*Andrade v. NAACP of Austin*, 345 S.W.3d 1 (Tex. 2011) ......................27

*Armstrong v. Manzo*, 380 U.S. 545 (1965) ............................................32

*Arrington v. City of Dallas*, 970 F.2d 1441 (5th Cir. 1992) ...................37

*Beaumont v. Bouillion*, 896 S.W.2d 143 (Tex. 1995) ............................12

*Bennett v. Spear*, 520 U.S. 154 (1997)..................................................23

*Bishop v.* Wood, 426 U.S. 341 (1976) ....................................................27

*Bledsoe v. City of Horn Lake, Miss.*, 449 F.3d 650 (5th Cir. 2006).........35

*Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024) ......................23

*Brittingham v. Ayala*, 995 S.W.2d 199 (Tex. App.—San Antonio 1999, pet. denied)..............................................................................50

*Chambers-Liberty Counties Navigation Dist. v. State*, 575 S.W.3d 339 (Tex. 2019).................................................................................27

*City of Austin v. Paxton*, 943 F.3d 993 (5th Cir. 2019)..........................25

*City of El Paso v. Heinrich*, 284 S.W.3d 366 (Tex. 2009).................. 12, 13

*City of Elsa v. MAL*, 226 S.W.3d 390 (Tex. 2007)............................ 12, 51

*City of Floresville v. Starnes Inv. Group, LLC*, 502 S.W.3d 859 (Tex. App.—San Antonio 2016, no pet.) .................................................46

*City of Houston v. 4 Families of Hobby, LLC*, 702 S.W.3d 698 (Tex. App.—Houston [1st Dist.] 2024, pet. filed) .....................................45

*City of Houston v. Downstream Env't., L.L.C.*, 444 S.W.3d 24 (Tex. App.—Houston [1st Dist.] 2014, pet. denied)............................. 42, 44

*City of Richardson v. Bowman*, 555 S.W.3d 670 (Tex. App.—Dallas 2018, pet. denied) ..................................................................38

*City of San Antonio v. TPLP Office Park. Props.*, 218 S.W.3d 60 (Tex. 2007) ......................................................................38

*Commons of Lake Hous., Ltd. v. City of Hous.*, 711 S.W.3d 666 (Tex. 2025) .............................................................................52

*County of Dallas v. Wiland*, 216 S.W.3d 344 (Tex. 2007) ......................29

*Craig v. Tejas Promotions, LLC*, 550 S.W.3d 287 (Tex. App.—Austin 2018, pet. denied) ...............................................................51

*Doss v. Morris*, Civ. No. SA-11-CV-00116-DAE, 2013 WL 2147460 (W.D. Tex. 2013) ..................................................................40

*Edelman v. Jordan*, 415 U.S. 651 (1974) ..............................................24

*Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591 (2008) ................. 47, 48

*Foucha v. Louisiana*, 504 U.S. 71 (1992) ..............................................38

*Gatesco Q.M. Ltd. v. City of Hous.*, 503 S.W.3d 607 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ...........................................38, 42

*Gen. Servs. Comm'n v. Little-Tex. Insulation Co., Inc.*, 39 S.W.3d 591 (Tex. 2001) ..................................................................54

*Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1 (1979) ......................................................................32

*Grounds v. Tolar Indep. Sch. Dist.*, 856 S.W.2d 417 (Tex. 1993) ......................................................................28, 29, 30

*Hall v. McRaven*, 508 S.W.3d 232 (Tex. 2017) .....................................13

*Hampton v. Equity Trust Co.*, 607 S.W.3d 1 (Tex. App.—Austin 2020, pet. denied) ...............................................................21

*Hartzell v. S.O.*, 672 S.W.3d 304 (Tex. 2023) ........................... 20, 25, 26

*Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468 (Tex. 2012) ...................................................................................57

*Heckman v. Williamson County*, 369 S.W.3d 137 (Tex. 2012) ... 19, 22, 23

*Hensley v. State Comm'n on Judicial Conduct*, 692 S.W.3d 184 (Tex. 2024) ...............................................................................13

*Honors Academy, Inc. v. Tex. Educ. Agency*, 555 S.W.3d 54 (Tex. 2018) ...............................................................................27

*House of Tobacco v. Calvert,* 394 S.W.2d 654 (Tex. 1965) ......................28

*Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154 (Tex. 2016) ............................................................... 18, 19, 42

*Hughes v. City of Garland*, 204 F.3d 223 (5th Cir. 2000) .......................37

*Image API, LLC v. Young*, 691 S.W.3d 831 (Tex. 2024) ................... 16, 17

*In re Garza,* 126 S.W.3d 268 (Tex. App.—San Antonio 2003, mandamus denied) ...........................................................50

*In re J.R.*, 652 S.W.3d 508 (Tex. App.—Houston [14th Dist.] 2022, pet. denied) ...............................................................38

*In the Interest of K.S.L.*, 538 S.W.3d 107 (Tex. 2017) ...........................32

*Jim Olive Photography v. Univ. of Houston Sys.*, 624 S.W.3d 764 (Tex. 2021) ...............................................................54

*Lakey v. Taylor*, 435 S.W.3d 309 (Tex. App.—Austin 2014, no pet.) .....38

*Limon v. State*, 947 S.W.2d 620 (Tex. App.—Austin 1997, no writ) ......28

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ..........................29

*LULAC v. City of Boerne*, 659 F.3d 421 (5th Cir. 2011) .........................23

*Marco Outdoor Adver., Inc. v. Reg'l Transit Auth.*, 489 F.3d 669 (5th Cir. 2007) ...............................................................33

*Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ...................................32

ix

*Morgan v. City of Alvin*, 175 S.W.3d 408 (Tex. App.—Houston [1st Dist.] 2004, no pet.)................................................................22

*Nelson v. Univ. of Tex. at Dallas*, 535 F.3d 318 (5th Cir. 2008).............20

*Ostrewich v. Tatum*, 72 F.4th 94 (5th Cir. 2023)..................................25

*Patel v. Texas Dep't of Licensing & Reg.*, 469 S.W.3d 69 (Tex. 2015) ...39, 48, 49

*Reynoso v. Dibs US, Inc.*, 541 S.W.3d 331 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ......................................................38

*Rivera v. Sonnenschein*, No. 03-21-00516-CV, 2022 WL 1751685, at *1, *6 (Tex. App.—Austin 2023, pet. denied) ..............................45, 46

*Rodriguez v. Serv. Lloyds Ins. Co.*, 997 S.W.2d 248 (Tex. 1999)............15

*Roe v. Patterson*, 707 S.W.3d 94 (Tex. 2025) ........................................37

*San Jacinto Savings & Loan v. Kacal*, 928 F.2d 697 (5th Cir. 1991) ..................................................................................39, 40

*SO Apartments LLC v. City of San Antonio, Tex.*, 109 F.4th 343 (5th Cir. 2024).................................................................................32

*Speech First, Inc. v. McCall*, 138 F.4th 219 (5th Cir. 2025) ..................20

*State v. Holland*, 221 S.W.3d 639 (Tex. 2007) ......................................54

*Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002)..............................................................................56

*Teeuwissen v. Hinds Cty., Miss., by and through its Bd. of Supervisors*, 78 F.4th 166 (5th Cir. 2023) ..............................28, 29, 30

*Tex. A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835 (Tex. 2007) .............22

*Tex. Ass'n of Bus. v. City of Austin, Tex.*, 565 S.W.3d 425 (Tex. App.—Austin 2018, pet. denied).............................................26, 27, 43

*Tex. Dep't of Public Safety v. Martin*, 882 S.W.2d 476 (Tex. App.—Beaumont 1994, no writ) ................................................................51

*Tex. Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648 (Tex. 2022) ..................................................................................28

*Tex. State Bd. of Pharmacy v. Steely*, 764 S.W.2d 806 (Tex. App.—Austin 1988, writ denied) .................................................................49

*Tex. Tel. Ass'n v. Public Utility Comm'n of Texas*, 653 S.W.3d 227 (Tex. App.—Austin 2022, no pet.)..............................................passim

*Tex. Workforce Comm'n v. Midfirst Bank*, 40 S.W.3d 690 (Tex. App.—Austin 2001, pet. denied)..................................................54, 56

*Univ. of Tex. Med. Sch. at Houston v. Than*, 901 S.W.2d 926 (Tex. 1995) ..................................................................................................32

*Van Boven v. Freshour*, 659 S.W.3d 396 (Tex. 2022)............................50

*Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635 (2002)..................................................................................................27

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 155-56 (1980)..............................................................................................55

*Williams on Behalf of J.E. v. Reeves*, 954 S.W.3d 729 (5th Cir. 2020) ...............................................................................................25, 26

## Statutes

42 U.S.C. § 1751 ......................................................................................55

42 U.S.C. § 1766 ................................................................. 13, 15, 30, 55

TEX. AGRIC. CODE § 12.0025 ...................................................................15

TEX. GOV'T CODE § 2001.174....................................................................49

## Other Authorities

89 FR 13150..............................................................................................17

## Rules

TEX. R. APP. P. 38.1.................................................................................21

## Regulations

4 TEX. ADMIN. CODE § 25.182 .............................................................. 14

4 TEX. ADMIN. CODE § 25.183 .............................................................. 30

4 TEX. ADMIN. CODE § 25.31 ............................................................... 30

7 C.F.R. § 226.15 ............................................................................... 41

7 C.F.R. § 226.6 .......................................................................... passim

| | |
|---|---|
| Nature of the Case: | This case arises from the Texas Department of Agriculture ("TDA")'s termination of Appellants' contractual participation in two federal aid programs—the Child and Adult Care Food Program ("CACFP") and the Summer Food Service Program ("SFSP"), both of which TDA administers on behalf of the USDA. With respect to Appellee Be a Champion, Inc. ("BAC"), TDA—through its officials—terminated BAC's contracts and its funding. As to the individual Appellees, James Hong, Kevin Klotz, George Moon, and Jaron Bargainer, TDA—again, acting through its officials—placed each individual on the National Disqualified List, thereby disqualifying their participation in any federally-funded food program for a period of at least seven years. After unsuccessfully attempting to resolve the disqualification and termination decisions directly with the TDA, Appellees filed suit, seeking redress pursuant to the Administrative Procedure Act ("APA"), the Declaratory Judgment Act ("UDJA"), and the U.S. and Texas Constitutions against TDA and various of its officers who Appellees sued both in their official and individual capacities. In response, Appellants filed a partial plea to the jurisdiction, which was not successful, thereby generating this appeal. |
| District Court: | The Honorable Jessica Mangrum, 200th Judicial District Court, Travis County, Texas. |
| District Court Disposition: | The district court denied Appellants' plea to the jurisdiction in its entirety. |
| Parties Below: | <u>Plaintiffs-Appellees</u>: Be a Champion, Inc., James Hong, Kevin Klotz, George Moon, and Jaron Bargainer<br><br><u>Defendants-Appellants</u>: As referenced in this brief, the "<u>Official Capacity Defendants</u>" include Sid Miller (TDA Commissioner), Terry Keel (TDA Deputy |

| | |
|---|---|
| | Commissioner), Laura Benavidez (TDA Administrator for Food & Nutrition), Lena Wilson (TDA Assistant Commissioner for the Food & Nutrition Division), Annette McBride (TDA Director of Community Operations), Carey Spence Lenss (TDA Assistant Director of Community Operations for Food and Nutrition), Senta Fortune (TDA Director of Community Operations for Food and Nutrition), Belia Montelongo (TDA Senior Administrative Review Specialists), Carl Crittendon (TDA Policy Analyst), and David Dierksen (TDA Assistant Director for Policy). And, when "Individual Capacity Defendants" is used, the list includes Laura Benavidez, Annette McBride, Cary Spence Lenss, Senta Fortune, Belia Montelongo, Celia Garcia, Carl Crittendon, and David Dierksen. |
| Related Proceedings: | None. |

## STATEMENT REGARDING ORAL ARGUMENT

This appeal presents straightforward legal issues on a clear and unambiguous set of facts on a limited record. As such, Appellees do not believe that oral argument will assist the Court in resolving the merits of this appeal. Should the Court determine otherwise, however, Appellees respectfully request the opportunity to participate in any oral argument the Court may later schedule.

## STATEMENT OF ISSUES PRESENTED

1.    Whether the district court properly denied Appellants' plea to the jurisdiction seeking the dismissal of Appellants' *ultra vires* claim on sovereign immunity grounds where Appellees sued numerous TDA officials in their official capacities, plausibly alleged that those officials acted without legal authority in the performance of a purely ministerial act, and sought only prospective relief.

2.    Whether the district court properly rejected Appellants' standing challenge where the pleadings alleged that Appellants' conduct caused BAC to be terminated from federal aid programs, thereby depriving it of millions of dollars in federal funding, and caused the individual Appellees to be disqualified from those programs, thereby prohibiting their participation in those or similar programs for a period of at least seven years.

3.    Whether the *Ex parte Young* exception to sovereign immunity applies to Appellees' federal claims against TDA officials brought against those individuals in their official capacities where Appellees seek prospective relief for ongoing federal constitutional violations resulting in ongoing harm to Appellees.

4.    Whether the district court properly rejected Appellees' plea for sovereign immunity where Appellees alleged facially valid violations of the Texas Constitution and, for the non-takings claims, sought prospective equitable relief against the TDA and various officials in their official capacities.

## INTRODUCTION

Appellants proffer no valid reason to disturb the district court's well-founded order denying Appellants' plea to the jurisdiction. Appellees properly sought prospective equitable relief against official-capacity defendants for an *ultra vires* claim and against official-capacity defendants and a state agency for the claims brought under the Texas Constitution. Each of these claims overcomes Appellants' sovereign immunity because the detailed factual allegations render the claims facially viable.

The pleadings also present an injury-in-fact fairly traceable to Appellants' conduct and that would be redressed by the relief sought, establishing Appellees' standing. Appellees' federal claims under 42 U.S.C. § 1983 against official-capacity defendants also seek prospective injunctive relief to redress ongoing violations of federal law and thus fall within the *Ex parte Young* exception. In short, Appellants do not enjoy immunity for the termination and disqualifications actions taken in direct contravention of Appellees' constitutional rights afforded by both the Texas and U.S. Constitutions.

## STATEMENT OF FACTS

Appellees pled a highly detailed account of the parties' historic relationship, the actions that gave rise to this lawsuit, and the legal framework that governs those actions. CR.94-119 (¶¶33-114). For each claim, the pleading specifically identifies its elements, the entities or individuals against whom it is asserted, the relief sought, and the basis for the Court's jurisdiction. CR.91-93 (¶¶20-28, 115-218). While Appellants urge a different standard, it is this pleading—not Appellants' circumscribed retelling thereof—that must guide the Court's assessment of Appellants' jurisdictional plea.

As detailed in the petition,[1] Jaron Barganier and James Hong founded Be A Champion, Inc. ("BAC") in 2001, with the goal of serving the youth in their community. CR.99-100 (¶¶52, 54). Over the next decade, BAC expanded to also provide food services. CR.100 (¶¶53-56). To expand the reach of that program, in 2014, BAC entered into a Permanent Agreement (the "Agreement") with the TDA to participate in the Child and Adult Care Food Program ("CACFP") and the Summer Food Service Program ("SFSP")—USDA programs that the TDA administers in Texas. CR.100 (¶57). Under the Agreement, BAC operated as an independent childcare center providing meals and snacks to at-risk youth for free or at a reduced-rate cost. *Id.* For both programs,

---

[1] In addition to the statement of facts, Appellees have appended a timeline of relevant events as Appendix 1 to this brief.

BAC received federal reimbursements, allowing it to serve more individuals at a lower cost. CR.86, 94 (¶35).

After executing the Agreement, BAC greatly expanded the scope of its operations to reach a greater number of individuals in need. *See* CR.101-03 (¶¶57-65). To that end, and with the TDA's full knowledge, BAC invested heavily in infrastructure, programming, and resources, and grew its workforce to nearly 1,000 employees throughout Texas. CR.100-01 (¶¶57-64); CR.117 (¶108).

As a part of the CACFP and SFSP program, the TDA would conduct periodic audits of the participants to ensure compliance with the TDA's regulatory standards. Notably, at no point during the **11** administrative reviews TDA conducted of BAC's operations between 2014 and 2021 did the agency ever issue BAC a serious deficiency finding, either for the CACFP or the SFSP. CR.102 (¶63).

In early 2022, TDA conducted another, purportedly routine CACFP review of BAC's operations. CR.107 (¶78). The TDA officials who conducted that review found no serious deficiencies. CR.107-08 (¶¶79-80). Despite that outcome, Appellant Carey Spence Lenss, the former Assistant Director of Community Operations for Food and Nutrition at TDA—who was *not* involved in BAC's CACFP review, instructed other TDA employees to find and issue serious deficiency findings. CR.108 (¶¶70-71). During the exit conference that eventually followed, Lenss claimed that other entities, unlike BAC, had zero food waste (an

allegation that was untrue) and that *any* waste amounted to a serious deficiency (another untrue statement). CR.108 (¶80). Appellees later learned that Lenss, aided by Appellants Laura Benavidez, Belia Montelongo, and Celia Garcia, had targeted BAC, including by telling TDA employees to elevate what should have been at most "findings" to "serious deficiencies"—a designation that carried dire consequences for BAC. CR.108 (¶81).

The "serious deficiencies" for which BAC was cited included things like a *single* meal at a *single* location not being counted, a *single* meal at a *single* location being inadvertently added to meal records, and understandable confusion as to whether a school day ended at the end of the school's operational hours or at the (earlier) end of academic instruction for each day. CR.109 (¶¶83-84). Notably, such "serious deficiency" findings were inconsistent with the TDA's own stated regulatory standards, as well as nearly a decade of BAC's past interactions with the agency. CR.108 (¶84).

Between May and November 2022, the TDA conducted a management review of the "serious deficiency" determination that ultimately generated a "serious deficiency" finding the TDA issued to BAC. CR.109 (¶85). At the same time, the TDA initiated an administrative review of BAC's SFSP participation. CR.103 (¶66). In the initial exit interview following that review, BAC was advised that the TDA found no serious deficiencies. *Id.* But, on the heels of that

4

interview, Lenss intervened and again instructed TDA employees to issue new "serious deficiency" findings that did not match the TDA's regulations or past practices. CR.104 (¶¶67-68).

After issuing the serious deficiency notices, TDA told BAC to submit a corrective action document ("CAD"). CR.110 (¶¶86-87). Although regulations, as well as the TDA's own Handbook, require the TDA to provide notice of "[t]he actions to be taken to correct the serious deficiency(ies)," the TDA failed to specify the corrective actions BAC should include in the CAD. *Compare* 7 C.F.R. § 226.6(c)(3)(iii)(A)(2) *and* 4 TEX. ADMIN. CODE § 25.182; CR.110 (¶88) , *with* CR.111 (¶89).

BAC timely submitted a CAD that exhaustively addressed every deficiency TDA identified. CR.111-12 (¶¶90-92). More specifically, BAC proffered a 97-page document that demonstrated, with detail, exactly how it would permanently correct each of the "serious deficiencies" identified. *See* CR.112 (¶¶91-92). Thereafter, six months passed without any response from the TDA, leading Appellees to believe the TDA had accepted the CAD. CR.112 (¶93).

After submitting its CAD, BAC submitted its SFSP renewal application in April 2023. CR.104 (¶69). Two days later, the TDA summarily rejected that application, citing an "open" serious deficiency finding that the TDA had never issued. CR.104-05 (¶69). As a result, BAC found itself unable to operate as a SFSP sponsor for the first time

5

since 2014, leaving it in possession of approximately 130,000 summer meals that ultimately went unserved. CR.105 (¶69).

On the heels of that SFSP determination, the TDA notified BAC that its CAD had been rejected and told BAC it had 13 days to submit corrected responses. CR.112 (¶¶93). Here again, the TDA provided no notice or explanation as to why the CAD was rejected or what the TDA expected to see in its stead. CR.113 (¶94). Acting without the benefit of that guidance, BAC went on to generate an even more fulsome, 307-page CAD in which it addressed every conceivable deficiency the TDA might identify. CR.113 (¶95).

Shooting in the dark, but determined to avoid termination and a permanent ban, Appellees also requested a meeting with TDA officials to better understand what the CAD needed to include. CR.113 (¶95). BAC met with several officials but received only very limited guidance with no explanation as to what the TDA expected for BAC to cure the "serious deficiencies" that remained. CR.113-14 (¶96). Thereafter, BAC submitted a new CAD that tracked TDA's limited guidance, expanding the detail set forth therein from 307 to 410 pages (not including supporting documentation). CR.114 (¶97).

Much like BAC had just experienced with the CACFP, the TDA next notified BAC that the TDA had, for the first time, identified serious deficiencies with its SFSP program in May 2023. CR.105 (¶70). In response, BAC submitted a CAD that addressed all of the alleged

6

deficiencies. CR.105 (¶71). Months later, however, TDA notified BAC that it was being terminated as a SFSP participant, falsely accusing BAC of failing to demonstrate corrective actions that would address each deficiency. CR.105-06 (¶72).

BAC timely appealed the SFSP termination. CR.106 (¶74). While the TDA's administrative review officer ("ARO") refused to consider the merits of the appeal, it concluded that the TDA had terminated BAC without requesting additional information or clarification in contravention of the governing regulations. CR.106 (¶¶74-75). The ARO therefore reversed the SFSP decision. CR.107 (¶76). That victory, however, ultimately proved hollow when the TDA placed Appellees on the National Disqualification List, thereby precluding their participation in *any* federally-funded food program, including the SFSP.

Around the same time the ARO reversed the SFSP termination, the TDA notified BAC that it was being terminated as a CACFP participant. CR.114 (¶99). The TDA included an assessment with that notice that, *for the very first time*, advised BAC of the TDA's expectations for the CAD it already had rejected. CR.114-16 (¶¶99-102). Of course, at that point, it was too late for BAC to respond in any meaningful way. CR.115 (¶¶ 100-01). Following that notice, BAC's Agreement was terminated and each Appellee was disqualified from "perform[ing] any Child Nutrition Program function, participat[ing] as a daycare home provider,

or serv[ing] as a principal in any organization or site in the Child Nutrition Programs." CR.115-16 (¶¶102-03).

In December 2023, BAC appealed the termination and disqualification order, requesting a hearing before the State Office of Administrative Hearings. CR.116 (¶104). That request was denied and, instead, a TDA officer oversaw a hearing at which BAC was not allowed to challenge the merits of the TDA's serious deficiency determination or rejection of BAC's extensive CADs. CR.116 (¶¶104-06). Without considering the merits, the ARO issued a final order affirming the TDA's orders. CR.116-17 (¶¶106-07). As a result, BAC lost millions in funding and was forced to lay off the overwhelming majority its employees. *See* CR.103 (¶65); CR.117 (¶108). BAC and its directors also were placed on the National Disqualification List—a list on which they will remain for at least seven years absent relief afforded by this lawsuit. CR.115-16 (¶¶102-03).

## SUMMARY OF THE ARGUMENT

Appellants' jurisdictional challenges are unfounded and the district court was right to reject them. While Appellants suggest that the Uniform Declaratory Judgment Act ("UDJA")'s waiver of sovereign immunity bars Appellees' claims, Appellees do not rely on—and, in fact, have pleaded around—that waiver. Likewise, the *ultra vires* exception to sovereign immunity applies to Appellees' *ultra vires* claim and others in which Appellees seek equitable relief for Texas constitutional

violations. Appellees plainly have standing to assert such claims, as they assert an injury-in-fact that fairly is traceable to the Appellants' actions and would be redressed by the prospective relief Appellees seek.

Appellants' challenges to Appellees' other constitutional claims fare no better. With respect to Appellees' Section 1983 claims against the Official Capacity Defendants, *Ex parte Young* applies and divests Appellants of their asserted sovereign immunity—Appellees allege ongoing violations of federal law, seek relief that is properly prospective, and name officials who are sufficiently connected to the violations at issue.

Appellees also have pleaded facially valid claims for Appellants' violations of the Texas Constitution. First, as to procedural due process, Appellees pleaded valid property and liberty interests implicated by Appellants' actions where Appellees were afforded insufficient notice or process. Contrary to Appellants' assertion, Appellees did not receive a "full evidentiary hearing." Indeed, Appellees were precluded from challenging either the serious deficiency determination or the sufficiency of their proposed CAD and, similarly, were prohibited from participating in a name-clearing hearing despite the stigmatizing charges the TDA lodged and publicized against them.

Second, Appellees pleaded facially valid substantive due process claims, alleging that Appellants exercised their power in an arbitrary and unreasonable way. While Appellants strain to construe the pleadings to

9

provide them with a legitimate interest justifying their actions, their analysis flips the burden of proof on its head. In truth, the pleadings must be constructed in Appellees' favor which, when so viewed, clearly demonstrate that Appellants had no legitimate interest in proceeding as they did.

Third, Appellees have pleaded sufficient facts to render an equal protection claim plausible. While Appellants argue otherwise, the authority upon which they rely is inapplicable to TDA's thoroughly-regulated oversight of the CACFP. None of these constitutional claims is barred by the "redundant remedies" doctrine, as the relief Appellees seek under the Texas Administrative Procedures Act ("APA") is not the same as the relief Appellees request to remedy Appellants' violations of the Texas Constitution.

Finally, the Court should reject Appellants' challenge to the takings claim. By terminating and disqualifying Appellees, TDA created extreme economic hardship and significantly interfered with Appellees' reasonable investment-backed expectations in protected property interests. Applying the requisite ad hoc factual analysis, the as-pleaded allegations support a takings claim, warranting affirmance of the district court's order.

I.    **Appellants' Arguments Regarding the *Ultra Vires* Exception and Waiver Under the UDJA Miss the Mark.**

Asserting sovereign immunity, the TDA and the Official Capacity Defendants urge the Court to dismiss Appellees' UDJA and *ultra vires* claims for lack of jurisdiction. *See* App. Br. at 22-35. The Court should decline this invitation, as Appellees do not rely on the UDJA's limited waiver provision, Appellees constitutional claims do not rely upon the *ultra vires* exception, and Appellees have pleaded a valid *ultra vires* claim that they plainly have standing to pursue.

A.    **The UDJA's immunity waiver is not at issue.**

While the amended petition cites the UDJA as a basis for Appellees' request for declaratory relief, they have never invoked the waiver provision of that Act to assert a jurisdictional hook for this or any other claim. *Compare* App. Br. at 33, *with* CR.91-93. As such, there is no merit to Appellants' plea for dismissal grounded on any jurisdictional provision of this Act, which amounts to a red herring.

B.    **Appellants are not immune from the *ultra vires* claim.**

Appellants provide an overview of the *ultra vires* doctrine that, while interesting, overlooks a key distinction between *ultra vires* claims and claims brought pursuant to the Texas Constitution. *See* App. Br. at 23-24. For both sets of claims, while monetary damages are unavailable, a plaintiff may pursue equitable remedies. *See City of Elsa v. MAL*, 226

S.W.3d 390, 381 (Tex. 2007) (citing *Beaumont v. Bouillion*, 896 S.W.2d 143, 144, 149 (Tex. 1995)). The difference lies in the identity of the parties who may be held subject to suit for the two claims. More specifically, an *ultra vires* claim "must be brought against the state actors in their official capacity," *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex. 2009), but "governmental entities may be sued for injunctive relief under the Texas Constitution," *MAL*, 226 S.W.3d at 381. These important distinctions are telling of merits of Appellants' plea for immunity for both claims.

1. **Appellees do not rely on the *ultra vires* exception for claims against the TDA.**

Contrary to Appellants' contention, Appellees neither "rely on the *ultra vires* exception to sue TDA" nor fail to "assert [a] viable waiver or exception to TDA's sovereign immunity for these claims." App. Br. at 24. Instead, Appellees facially invoke *MAL*, to waive sovereign immunity of both the TDA and the Official Capacity Defendants for the injunctive relief they seek. CR.91 (¶23). As such, this argument fails.

2. **Appellees pleadings are facially sufficient to establish Appellants' *ultra vires* acts and to demonstrate a lack of immunity for those acts.**

Under the governing regulations and the TDA's own handbook, the TDA must give notice of any putative "serious deficiency" and *provide the specific corrective action(s) needed* before terminating or disqualifying a CACFP participant. CR.128-29 (¶148). The Official Capacity

Defendants violated these requirements by terminating and disqualifying Appellees without providing appropriate notice, either with respect to the nature of the "serious deficiencies" at issue or the acceptable corrective actions that should be submitted. CR.128-29 (¶¶148-50). In so doing, they acted *ultra vires*. CR.129 (¶¶ 148-52).

"To fall within [the] *ultra vires* exception, a suit . . . must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Heinrich*, 284 S.W.3d at 372. "An *ultra vires* claim . . . has two fundamental components: (1) authority giving the official some (but not absolute) discretion to act and (2) conduct outside of that authority." *Hall v. McRaven*, 508 S.W.3d 232, 239 (Tex. 2017). "Sovereign immunity bars suits complaining of legal errors stemming from the exercise of the officer's *absolute* discretion but not suits complaining of those errors stemming from an officer's exercise of *limited* discretion." *Hensley v. State Comm'n on Judicial Conduct*, 692 S.W.3d 184, 201 (Tex. 2024) (emphasis in original).

Exercising its authority to administer the CACFP, the TDA must "provide, in accordance with regulations promulgated by the Secretary, an opportunity for a fair hearing and a prompt determination to any institution aggrieved by any action of the State agency that affects the participation of the institution in the program." 42 U.S.C. § 1766(e)(1)(A) (emphasis added); 7 C.F.R. § 226.6(c)(3)(iii) ("If the State agency determines that a participating institution has committed one or more

13

serious deficiency[ies] . . . [it] must . . . provide the institution and the responsible principals . . . notice of the serious deficiency(ies) and an opportunity to take corrective action."). The notice must specify the serious deficiencies at issue, the actions that must be taken to correct those deficiencies, and that a "failure to fully and permanently correct the serious deficiency(ies) within the allotted time will result in denial of the institution's application," as well as disqualification. 7 C.F.R. § 226.6(c)(3)(iii)(A)(1)-(2), (5). These requirements are repeated in the CACFP Handbook and the TDA's regulations. CR.110; 4 TEX. ADMIN. CODE § 25.182 ("TDA will impose adverse actions against any contractor for failure to comply with CACFP requirements in accordance with 7 C.F.R. §226.6, TDA CACFP Handbooks, and this Division").

In the notice letter Benavidez issued to BAC, she did not specify any corrective actions BAC needed to take to remedy the deficiencies at issue. CR.110-11. Indeed, the letter provided "no guidance about TDA expectations for the corrective action plan" and said nothing about the corrective actions the TDA would accept. CR.111 (¶89). Even after Appellees submitted voluminous CADs to remedy the vague "deficiencies" the TDA had identified, the TDA waited until after it already had terminated BAC as a CACFP participant (and, in turn, a SFSP participant) to provide the requisite CAD guidance. CR.110-15. The Official Capacity Defendants had no authority to operate in this manner, which plainly violated the notice requirements set forth in the

14

TDA's own regulations. *See* TEX. AGRIC. CODE § 12.0025(6); 42 U.S.C. § 1766(e)(1)(A); 7 C.F.R. § 226.6; *see also, e.g., Rodriguez v. Serv. Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999).

TDA's immunity defense is similar to that which the Third Court rejected when the Public Utility Commission ("PUC") attempted to raise the very same defense in *Texas Telephone Association v. Public Utility Commission of Texas*, 653 S.W.3d 227 (Tex. App.—Austin 2022, no pet.). There, the PUC created regulations to govern its administration of the Texas Universal Service Fund ("TUSF")—a fund the legislature charged the PUC with administering to ensure affordable telecommunications service across Texas. *Id.* at 237. After the PUC stopped paying the full amounts due under the PUC's own orders, rural telecommunications providers sued, alleging that the PUC officials' actions were "*ultra vires* because they violated the policies and practices established by [the statute], the Commission's rules, and the Commission's orders." *Id.* at 244. Responding, the PUC asserted that its officials had "essentially unconstrained discretion" because the Commissioner had statutory authority to "act as necessary and convenient to administer the funds and this chapter." *Id.* at 250.

The Third Court rejected this "boundless discretion" argument, finding it "[s]ignificant[]" that PUC officials were not following their "own rules." *Id.* at 251, 254. Finding the pleadings "sufficient to confer the trial court with jurisdiction," the Court concluded that the "[statute], the

Commission's own rules, and the Commission's final orders establishing monthly support amounts all constrain the Commission and its Commissioners' limited discretion" and that, by acting contrary to these constraints, "the Commissioners acted without legal authority." *Id.* at 253-54. The same analysis applies to the TDA officials' *ultra vires* acts in this case, which similarly were undertaken without legal authority in direct contravention of the TDA's own rules. *Compare, e.g., id.* at 251. As such, the district court did not err in denying Appellants' plea to the jurisdiction as to Appellees' *ultra vires* claim.

### 3. Appellees seek logically necessary relief.

Appellants also assert—for the very first time on appeal—that Appellees' "requested relief is not logically necessary to give effect to the CACFP's regulations." *See* App. Br. at 28. Advancing this argument, appellants rely on *Image API, LLC v. Young*, wherein the Court allowed the Health and Human Services Commission ("HHSC") to recoup audit-confirmed overcharges from a Medicaid contractor even though the HHSC conducted the audit beyond the mandatory statutory deadline. 691 S.W.3d 831, 834 (Tex. 2024). In *Young*, however, the contractor did not object to the audit when it was being conducted or the results of that audit showing that the contractor, in fact, had been overpaid. *Id.* at 843-44. As such, the Court found that the requested remedy—an order precluding the HHSC from seeking recoupment of the overpayment—

16

would not be "logically necessary" to give effect to the governing statute requiring the audit to be completed within a certain deadline. *Id.* at 843.

Here, by comparison, the regulations require the TDA to provide notice of both the serious deficiency and the corrective action needed to resolve that deficiency for the very purpose of providing the recipient a meaningful opportunity to "fully and permanently correct [the issue] within the allotted time." 7 C.F.R. § 226.6(c)(3)(iii)(A)(2), (5); *see also* CR.110; 89 FR 13150-51. These requirements, in fact, are designed to help the TDA "document the case to terminate and disqualify non-performing CACFP institutions ***that are unwilling to or incapable of resolving their serious deficiencies***." *Id.* at 13151 (emphasis added). BAC is not such an "unwilling" or "incapable" institution. Instead, BAC would have complied with the TDA's instructions regarding an acceptable CAD—instructions the TDA never provided in violation of the governing regulations. CR.111-15. To remedy this *ultra vires* notice failure, Appellees seek to restore the status quo that existed at the time the failure occurred, CR.129 (¶151), by allowing them to cure the deficiencies the TDA identified for the first time in its final termination letter and requiring the TDA to identify any future deficiencies and the actions needed to correct them *before* termination decisions are made, *id.*

17

## 4. Appellants lack "absolute discretion" to ignore regulations or terminate BAC's CACFP participation without appropriate notice.

The Official Capacity Defendants gave notice of a deficiency without actually finding an actionable deficiency, rejected BAC's CAD that strictly followed the TDA's limited instructions, and terminated and disqualified BAC without an actionable violation or appropriate notice. *See, e.g.*, CR.128-29. While Appellants suggest that they had effectively absolute discretion to take these actions, thereby affording them with immunity, App. Br. at 26-27, absolute discretion is far more limited. *See Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 163 (Tex. 2016) ("absolute" discretion means "free decision-making without any constraints"); *see also id.* at 167 (juxtaposing "absolute" and "limited" discretion based on whether officer discretion "is otherwise constrained by the principles of law").

Here, the Official Capacity Defendants did not have absolute discretion with respect to the administration of the CACFP. Rather, they were required to comply, among other things, with 7 C.F.R. § 226.6 and the TDA CACFP Handbook, both of which cabined their discretion to oversee "the Serious Deficiency Process" and termination and disqualification decisions. 4 TEX. ADMIN. CODE § 25.182. The regulations also impose substantive limitations on the TDA's discretion, cabining "serious deficiencies" to a pre-defined list, rather than any aspect of an institution's CACFP participation with which a TDA official may take

18

issue. *See* CR.96 (citing 7 C.F.R. § 226.6(c)(3)(ii); CACFP Handbook at § 10000, 10-11). Respectfully, the Court need look no further than the face of Appellees' pleading—a pleading that demonstrates that the TDA officials plainly did not follow these rules—to uphold the district court's denial of the plea. *Compare, e.g., Houston Belt*, 487 S.W.3d at 168-69 (directing courts to assess the pleadings to vet whether a plaintiff has stated a valid *ultra vires* claim); *Tex. Tel. Ass'n*, 653 S.W.3d at 254 (holding, where rules constrained agency action, that pleaded conduct taken in contravention of those rules supported an *ultra vires* claim).

> **5. Appellees have standing to bring an *ultra vires* claim.**

Appellees also have standing to obtain relief pursuant to their *ultra vires* claim. *Cf.* App. Br. at 33-35. To establish standing, Appellees simply must demonstrate (1) an actual or imminent injury that is (2) fairly traceable to the challenged conduct and (3) likely to be redressed by the requested remedy. *Heckman v. Williamson County*, 369 S.W.3d 137, 154-55 (Tex. 2012).

First, Appellees allege injuries-in-fact: the termination of their CACFP (and, in turn, SFSP) participation, which cost them millions and barred them from participating in any child nutrition program for at least seven years. CR.103-19. Second, these injuries are fairly traceable to the conduct of each Official Capacity Defendant, whose individual involvement is set forth on a paragraph-by-paragraph basis that

19

Appellants have not challenged. *Id.* Third, Appellees' requested remedy—reinstatement and an opportunity to receive appropriate notice and submit a responsive CAD with guidance from the TDA—would redress the injury created by Appellants' *ultra vires* acts. CR.129-30; *see also, e.g., Hartzell v. S.O.*, 672 S.W.3d 304, 319 (Tex. 2023) (holding that "restoration of [plaintiff's] degree on a forwards-looking basis" was prospective relief and that "an injunction ordering the degree reinstated and the penalty removed from her records pending a new hearing would be appropriate"); *cf. Nelson v. Univ. of Tex. at Dallas*, 535 F.3d 318, 324 (5th Cir. 2008) (holding that "a request for reinstatement is . . . a claim for prospective relief").

Appellants challenge as "speculative" the request that the TDA officials be required to follow their regulations when dealing with BAC in the future. App. Br. at 34-35. Not so. Given the interactions that led to BAC's termination and disqualification, it is far from speculative that, absent a judicial order, the TDA will not comply with the rules requiring it to provide sufficient notice and an opportunity to cure—the relief Appellees seek. CR.52-119. Appellants' assurances to the contrary—that it will now abide by its regulatory duties in the future despite not doing so in the past—ring especially hollow in a suit in which TDA officials also claim to have absolute discretion to administer the CACFP in any manner they see fit, including one that violates their own rules. *Cf. Speech First, Inc. v. McCall*, 138 F.4th 219, 223-24 (5th Cir. 2025) (when

the defendant is still defending the challenged policy, it suggests a live dispute).

## II. The Pleadings Plausibly Demonstrate Appellees' Standing to Pursue All of Their Asserted Claims.

Appellants next argue that Appellees lack standing to pursue all but their APA and takings claims. App. Br. at 35-37. As in the trial court, however, Appellants do not articulate a reasoned basis for this assertion, instead selecting "just a few problematic examples" to highlight to the Court. *Id.* at 36; *see also* CR.541 (same). While the Court should adjudicate the merit of those "few . . . examples," Appellants have waived their standing challenge to any other claim or party. *See* TEX. R. APP. P. 38.1(f); *Hampton v. Equity Trust Co.*, 607 S.W.3d 1, 6 (Tex. App.— Austin 2020, pet. denied).

First, Appellants fail to attack Appellees' standing to sue the TDA, thereby waiving such challenge. Appellees, of course, do have standing to sue the TDA, as the pleadings allege financial and reputational injuries fairly traceable to the TDA's actions that would be redressed by the prospective relief requested. *See* CR.107-28; *see also supra*, Argument, § I(5). For these reasons, Appellees also have standing to pursue claims against the Official Capacity Defendants—claims that are effectively claims against the TDA. Indeed, "[a] suit against a state official in his official capacity 'is not a suit against the official personally, for the real party in interest is the entity.'" *Texas A&M Univ. Sys. v.*

*Koseoglu*, 233 S.W.3d 835, 844 (Tex. 2007) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)); *see also Morgan v. City of Alvin*, 175 S.W.3d 408, 414 (Tex. App.—Houston [1st Dist.] 2004, no pet.) ("A suit against an [] officer in his official capacity is merely another way of pleading a suit against the governmental entity of which the officer is an agent.").

Appellants' assertion that Appellees must allege each officials' personal involvement to establish standing, App. Br. at 35-36, simply is wrong. *See Koseoglu*, 233 S.W.3d at 844. Indeed, the Texas Supreme Court has rejected any such requirement. *Heckman*, 369 S.W.3d at 158. In *Heckman*, a class brought claims against a constitutional county judge, three county court at law judges, and a magistrate judge. *Id.* Even though there was "undisputed evidence that a visiting judge" had committed the alleged constitutional infraction, rather than "any of the defendant county court at law judges," *id.* at 144-45, the *Heckman* Court found that plaintiffs had standing because their claims were asserted against the defendant judges in their *official* capacities, *id.* at 158. Thus, while the alleged injury was not "fairly traceable" to the individual officials, it was "fairly traceable" to their offices, providing plaintiffs standing to sue those offices. *Id.* at 157-58. The same is true here, where Appellees allege wrongdoing on the part of TDA officials that is "fairly traceable" to the office of the TDA.

Appellants also assert that claims against "high-ranking officers" named *only* in their official capacities, CR.85, should be dismissed for

22

lack of standing because there is no allegation that they personally violated Appellees' constitutional rights. App. Br. at 35-36. At the same time, Appellants argue that "low-level officials" should be dismissed because there are insufficient allegations to demonstrate their authority to effectuate the relief BAC seeks. *Id.* at 36. In advancing these competing arguments, Appellants construct an artificial Catch-22 pursuant to which Appellees cannot obtain any relief, because high-level officials purportedly lack personal involvement, but low-level officials purportedly lack sufficient authority to effectuate relief. *Id.* This, of course, is not the law. *See, e.g., Heckman*, 369 S.W.3d at 157-58.

Finally, as to the Section 1983 claims Appellees brought against the Individual Capacity Defendants, Appellees have alleged facts demonstrating the requisite causal connection to establish standing. CR.134-39. "To prove traceability, Plaintiffs must allege 'a causal connection between the injury and the conduct complained of.'" *Book People, Inc. v. Wong*, 91 F.4th 318, 332 (5th Cir. 2024). "The causation element does not require a party to establish proximate causation, but only requires that the injury be 'fairly traceable' to the defendant." *LULAC v. City of Boerne*, 659 F.3d 421, 428 (5th Cir. 2011) (citing *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997)).

Appellants further suggest that standing requires Appellees to allege that their injuries would not have occurred but for the specific actions of each individual defendant. App. Br. at 36. But in *Air Evac*

*EMS, Inc. v. Texas Department of Insurance, Division of Workers' Compensation*, the Fifth Circuit rejected exactly this species of argument, holding that the actions that "initiate[d] the first step in the [] process" that plaintiffs challenged were not "too attenuated to be the cause of [the plaintiff's eventual] injury." 851 F.3d 507, 514 (5th Cir. 2017). Here, too, the Individual Capacity Defendants' actions are not so attenuated to preclude a finding of standing; rather, the pleadings describe specific actions taken by the individual defendants that are fairly traceable to the injuries Appellees ultimately experienced (termination from the CACFP and SFSP, loss of funding, and disqualification). *See* CR.103-19 (¶¶66-114). Nothing more is required and Appellants' standing challenge should remain rejected.

## III. Appellees' Section 1983 Claims Fall Under *Ex Parte Young.*

*Ex parte Young* provides an exception to sovereign immunity for federal claims against state officials sued in an official capacity. *Edelman v. Jordan*, 415 U.S. 651, 664-68 (1974) (citing *Ex parte Young*, 209 U.S. 209 (1908)). Appellants argue that *Ex parte Young* does not apply because (1) the Official Capacity Defendants lack a sufficient connection to the challenged acts and (2) Appellees do not allege ongoing violations of procedural due process, substantive due process, or equal protection. App. Br. at 37-38. Both arguments fail.

First, to establish a sufficient causal connection, Appellees simply must plead that the state official has "some connection with the

24

enforcement of the challenged act." *Ostrewich v. Tatum*, 72 F.4th 94, 100 (5th Cir. 2023). Where, for example, the suit involves enforcement of a challenged law, challengers need only show a "scintilla of enforcement" by the official. *City of Austin v. Paxton*, 943 F.3d 993, 998 (5th Cir. 2019). Appellees easily meet that standard here, as each TDA official named in an official capacity is alleged to have some connection with the unlawful actions at issue, either personally or through their office. *See* CR.134-41.

Second, "[a]s long as the claim seeks prospective relief for ongoing harm, the fact that a current violation can be traced to a past action does not bar relief under *Ex parte Young*." *Williams on Behalf of J.E. v. Reeves*, 954 S.W.3d 729, 738 (5th Cir. 2020). Thus, for example, a state employee who claims to have been terminated in violation of federal law experiences an ongoing violation until reinstatement, even though the termination is a one-time, past event. *Nelson*, 535 F.3d at 324 (holding that "a request for reinstatement is . . . a claim for prospective relief designed to end a continuing violation of federal law").

The same is true in Texas. In *Hartzell v. S.O.*, for instance, a graduate student sued a university for allegedly violating her due process rights when it revoked her doctoral degree—an action she sought to remediate with injunctive relief in the form of an order reinstating her degree and removing any indication of a prior revocation from her record. 672 S.W.3d at 319. "The University officials argue[d] that these claims remain[ed] barred by sovereign immunity because [the plaintiff] [sought]

25

only 'backwards-looking' retrospective relief to rectify an 'already-complete governmental action.'" *Id.* The Court disagreed, holding that the "restoration of her degree" was prospective and that "an injunction ordering the degree reinstated and the penalty removed from her records pending a new hearing would be appropriate," should she prevail. *Id.* at 320. In other words, the fact that the wrong had occurred in the past did not provide the University officials with their asserted immunity. *Id.*

Here too, the Official Capacity Defendants' violation of federal law is ongoing, as the wrong they committed resulted in Appellees' permanent termination and disqualification from the CACFP and SFSP that Appellees seek to remedy by way of reinstatement. CR.115-17, 120, 136-39 (¶¶ 102-08, 119, 188, 193, 199); *see also Reeves*, 954 S.W.3d at 738. The resulting harm is ongoing because, as long as Appellees remain on the National Disqualification List, they are barred from participating in any federal food program. *Id.* As such, Appellees have pleaded proper Section 1983 claims for which Appellants are not immune pursuant to *Ex parte Young* and its progeny. The Court should therefore affirm the district court's denial of Appellants' plea.

## IV. Appellees Pled Facially Valid Claims.

Typically, a plea to the jurisdiction does not implicate the merits of the case. *See Texas Ass'n of Bus. v. City of Austin, Tex.*, 565 S.W.3d 425, 431 (Tex. App.—Austin 2018, pet. denied). But in some cases, "the jurisdictional inquiry may unavoidably implicate the underlying

substantive merits of the case when, as often happens in *ultra vires* claims, the jurisdictional inquiry and the merits inquiry are intertwined." *Chambers-Liberty Counties Navigation Dist. v. State*, 575 S.W.3d 339, 345 (Tex. 2019); *see also Andrade v. NAACP of Austin*, 345 S.W.3d 1, 11 (Tex. 2011) (holding that immunity from suit is not waived if the constitutional claims are facially invalid). Even when analyzing whether the pleadings allege a facially valid claim, however, courts must construe the pleadings liberally in favor of the plaintiff. *Tex. Ass'n of Bus.*, 565 S.W.3d at 435-36. Applying this standard, Appellees' procedural due course of law, substantive due course of law, equal protection, *ultra vires*, and takings claims are facially valid and plainly overcome Appellants' plea for sovereign immunity.[2]

## A. Appellees' procedural due-course of law claim based on a property interest is facially valid.

### 1. Appellees allege a valid property interest.

It is well established that a contract can create a property interest. *See Bishop v.* Wood, 426 U.S. 341, 344 (1976); *Honors Academy, Inc. v. Tex. Educ. Agency*, 555 S.W.3d 54, 61 (Tex. 2018). Here, the pleadings and the reasonable inferences drawn therefrom show that Appellees' contract with the TDA created a property interest for the duration of the

---

[2] Appellants do not present a merits-based jurisdictional challenge to Appellees' federal constitutional claims, and for good reason. "[T]he inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim." *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002).

contract, requiring the TDA to afford meaningful process before termination.

"[A] privilege that cannot be taken away except for good cause may rise to the level of a vested property right that the due-process and due-course clauses protect." *Texas Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648, 656, 656 n.22 (Tex. 2022) (citing *House of Tobacco v. Calvert*, 394 S.W.2d 654, 657 (Tex. 1965)). "Some substantive limit on the State's discretion is an essential characteristic of a property interest warranting constitutional protection." *Grounds v. Tolar Indep. Sch. Dist.*, 856 S.W.2d 417, 418 (Tex. 1993). "[O]nce the state has granted a privilege to conduct one's business or profession, such privilege may become a right protected by due process." *Limon v. State*, 947 S.W.2d 620, 626 (Tex. App.—Austin 1997, no writ). "[I]n those situations due process applies to protect the claimant from arbitrary revocation or suspension of the right to conduct business *during the term such right was granted*." *Id.* (emphasis in original).

For example, in *Teeuwissen v. Hinds County, Mississippi, by and through its Board of Supervisors*, a state law authorized the defendant, a government board, "to employ counsel by the year." 78 F.4th 166, 168 (5th Cir. 2023). Pursuant to that law, the board hired counsel for a one-year term via contracts that required payment for a full year's worth of work, even if terminated early. *Id.* at 169-70. Three months later, the board terminated the contracts and refused to issue any additional

payments. *Id.* at 169. In response, counsel raised a Fourteenth Amendment challenge, alleging that the non-payment deprived them of protected property interests. *Id.* The Fifth Circuit agreed, holding that state law, coupled with the contracts, created "a protected property interest in the money that the contracts' early-termination provisions guaranteed." *Id.* at 170-71.

Likewise, in *Grounds v. Tolar Independent School District*, the Texas Supreme Court considered the effect of the Term Contract Renewal Act, which required "preestablished reasons for nonrenewal of teaching contracts in addition to notice and a hearing." 856 S.W.2d at 418. The Court compared the effects of the Act to "an individual entitlement grounded in state law, which cannot be removed except 'for cause,'" concluding that the statute's "requirement of preestablished reasons for nonrenewal constitutes a substantive limit on the State's discretion creating a property interest." *Id.* (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982)). "The fact that the State retains some discretion in its decisions does not preclude the existence of a property interest." *Id.*; *see also County of Dallas v. Wiland*, 216 S.W.3d 344, 349, 353-54 (Tex. 2007) (holding that manual which created "expectation in continued employment except for just cause" generated a "property interest of which employees may not be deprived without due process").

Here, BAC executed a "Permanent Agreement" with the TDA, which constituted "a legally binding document between TDA and [BAC]."

29

CR.95, 100-01 (¶¶37, 57-64); *see also* 4 TEX. ADMIN. CODE § 25.31 ("The agreement is a legally binding document that specifies the rights and responsibilities of both the contractor and TDA"). By its terms, the Agreement is durational, renewed every federal fiscal year. CR.95 (¶38). The pleadings allege—and the applicable regulations confirm—"[w]hen TDA decides to terminate an agreement with a contracting entity like BAC, it must do so 'according to [the governing C.F.R. provisions]; [42 U.S.C. § 1766)]; and TDA CACFP Handbooks.'" CR.95-96 (¶41) (quoting 4 TEX. ADMIN. CODE § 25.183). As such, there is a substantive limit on the State's discretion to terminate a contract mid-term, as the TDA did in this case, and the Agreement, coupled with the governing regulations, created a protected property interest for the contract's duration. *See Teeuwissen*, 78 F.4th at 168-70; *Grounds*, 856 S.W.3d at 418.

Arguing otherwise, Appellants contend that the TDA could terminate the Agreement with BAC at any time. App. Br. at 40 (citing 7 C.F.R. § 226.6(b)(4)(ii)). That provision, however, is not so broad, providing that "[t]he State agency or institution may terminate the agreement at its convenience *for considerations unrelated to the institution's performance* of Program responsibilities under the agreement." 7 C.F.R. § 226.6(b)(4)(ii) (emphasis added). "However, any action initiated by the State agency to terminate an agreement for its convenience *requires prior consultation with [the USDA]*." *Id.* (emphasis added). Critically, "[t]ermination for convenience *does not*

***result in ineligibility for any program*** authorized under this part or parts 210, 215, 220, or 225 of this chapter." *Id.* (emphasis added).

As is clear from this language, there are three key problems with Appellants' assertion that the regulation negates Appellees' property interest. *First*, a termination that requires the TDA to consult with a federal agency before effectuating a termination is not "discretionary." *Second*, a "convenience" termination cannot result in program ineligibility, yet BAC and each individual Appellee were put on the National Disqualification List when BAC's contract was terminated. *See* 7 C.F.R. § 226.6(b)(4)(ii). *Third*, a convenience termination plainly is not what happened here. The TDA terminated BAC's contract due to alleged "serious deficiencies," did not consult with the USDA to effectuate that termination, and disqualified Appellees from participating in the CACFP, the SFSP, or any other federal nutrition program. Lacking any authority supporting the TDA's discretion to terminate BAC's contract for cause, BAC and its directors were afforded process that they plainly did not receive.

The Agreement, state and federal regulations, and the CACFP Handbook each imposed substantive and procedural limits on Appellants' discretion to terminate the Agreement and place Appellants on the National Disqualification list. Together, these authorities created a property interest for the duration of the Agreement of which Appellees were deprived, triggering due process guarantees.

### 2. Appellees' assertion of deficient process is facially valid.

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). "It is axiomatic that due process . . . calls for such procedural protections as the particular situation demands." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 12 (1979); *see also Univ. of Tex. Med. Sch. at Houston v. Than*, 901 S.W.2d 926, 930 (Tex. 1995). Here, the "particular situation" demanded more process than the TDA allowed.

The due process analysis rests on a "balancing between the private and governmental interests concerned." *SO Apartments LLC v. City of San Antonio, Tex.*, 109 F.4th 343, 350 (5th Cir. 2024). Courts must "balance three elements: the private interests at stake, the government's interest supporting the challenged procedure, and the risk that the procedure will lead to erroneous decisions." *In the Interest of K.S.L.*, 538 S.W.3d 107, 114 (Tex. 2017). All three factors reveal the inadequacy of the process Appellants afforded.

*First*, the affected private interests are significant. BAC has lost millions in funding because of Appellants' actions, resulting "in more than 130,000 summer meals not being served to communities in need and caus[ing] BAC to lay off more than 100 employees." CR.103-04, 130, 134

(¶¶65, 69, 152, 181).   In addition, each Appellee is now individually barred from participation in *any* federally-backed school food and nutrition program for at least seven years.  CR.96, 99, 115-16, 120 (¶¶42, 51, 102, 119).  "Not only have [Appellees] lost a huge source of funding for public services, [the] public stigma associated with placement on State and National Disqualification Lists serve[s] as a badge of shame."  CR.125 (¶135).

*Second*, TDA's interest in supporting the challenged procedure is low.   From a notice perspective, Appellants could have provided the requisite notice at any point before sending BAC a final termination letter, but intentionally withheld information until it was too late for Appellees to respond.  Notably, the notice Appellees seek is no more than that which agency regulations already require.  *See, e.g.,* 7 C.F.R. § 226.6(c)(3).  And, as for a meaningful opportunity to be heard, while contracting entities can appeal adverse determinations to another TDA official, CR.116 (¶104), they cannot challenge the substance of a serious deficiency determination or argue the sufficiency of a proffered CAD.  *See* CR.124-25 (¶¶ 134-35).  As such, the hearing is not meaningful, yet the due process implications are significant.  *See Marco Outdoor Adver., Inc. v. Reg'l Transit Auth.*, 489 F.3d 669, 673 (5th Cir. 2007) ("The 'root requirement' of due process is 'that an individual be given an opportunity for a hearing **before** he is deprived of any significant property interest.'" (emphasis in original)).

33

*Third*, there is a significant risk of erroneous deprivation if the TDA's process is allowed to stand. While Appellants baldly assert that they afforded adequate process, App. Br. at 42-46, the pleadings allege facts that create the reasonable inference that any process the TDA afforded was not, in fact, meaningful or sufficient. At best, Appellees were allowed to submit a CAD, but Appellants deliberately and purposefully withheld notice as to what that document should contain until they already had terminated BAC's contract and disqualified it and its principals. CR.111-16 (¶¶89-102). Indeed, it was only in the final termination letter that the TDA provided new and surprising details about the basis of its serious deficiency determinations and the reasons it rejected BAC's CADs. CR.114 (¶99), 121 (¶123). Those details "demonstrate a classic example of 'moving the goal posts,' challenging minute details of the plan by expressing criticisms that easily would have been resolved had they been communicated at any time earlier in the process." CR.114 (¶99).

A careful review of the pleadings demonstrates just how little process BAC was actually afforded. For example, while BAC "included 24 pages describing the step-by-step processes and procedures BAC had adopted to ensure that all sponsored sites completed the meal count forms according to program requirements," CR.114 (¶98), the TDA rejected the proposal because it "did not include any steps that indicate that [BAC] will immediately follow up with the individuals who are

34

responsible for completing the meal count form," CR.115 (¶100). Of course, the TDA had never provided notice that such a requirement would be imposed, let alone that its absence would lead to rejection of the proffered CAD. CR.115 (¶101). Regardless, such a requirement was completely unnecessary, as BAC's proposal included a mandatory across-the-board re-training designed to ensure that the identified issue did not happen again at any individual site. *Id.* If nothing else, a decision like this—of which BAC was never afforded a meaningful opportunity to challenge—highlights the serious disconnect between the *de minimus* process Appellees were afforded and the requisite constitutional process.

## B. Appellees' procedural due-course-of-law claim based on a stigma-plus liberty interest is facially valid.

Appellants also deprived Appellees of a stigma-plus liberty interest. *See* CR.120, 125 (¶¶119, 135). Such an interest arises when the government takes an adverse action that creates a false and defamatory impression, stigmatizing and foreclosing the party and foreclosing it from other economic opportunities. *See Bledsoe v. City of Horn Lake, Miss.*, 449 F.3d 650, 653 (5th Cir. 2006). The combination of the adverse action and the stigma gives rise to a protected liberty interest. *Id.*

Here, Appellants contest that: (1) Appellees were provided insufficient notice or an opportunity to be heard before termination, (2) the stigmatizing charges were false, (3) Appellees made a request for a name-clearing hearing that was denied, and (4) stigmatizing charges

35

were made public. App. Br. at 47-49. The factual allegations, together with the reasonable inferences drawn therefrom, more than support each of these elements—something the district court properly recognized in rejecting Appellants' plea.

*First*, Appellees did not receive proper notice or a meaningful opportunity to be heard before their termination. Notice of Appellees' specific alleged wrongdoing was withheld until it was too late for BAC to redress the concerns in any meaningful way to avoid contractual termination and disqualification. CR.115 (¶¶ 100-01).

*Second*, Appellants made false charges against Appellees that were so stigmatizing that Appellees (including the individual directors) are now banned for seven years from participating in *any* federal food program. *See, e.g.*, CR.109 (¶¶83-84); 7 C.F.R. § 226.6(c)(7)(iv). While Appellants assert that mere disagreement with the TDA's determinations does not equal falsity, App. Br. at 47, that does not afford the pleading the deference it is due. As pleaded, BAC asserts far more than a mere disagreement with TDA decision-making; rather, BAC alleges that the facts upon which the TDA relied for its termination determination were either inaccurate or so trivial that they could not amount to a serious deficiency warranting the result that ultimately transpired. CR.105-06, 131 (¶¶72, 157). The TDA's published assertion that Appellees engaged in conduct amounting to a serious,

disqualification-triggering deficiency, as defined in the applicable regulations, therefore is false. Nothing more is required at this juncture.

*Third*, Appellees sought a name-clearing hearing by "request[ing] a formal hearing before an ALJ at SOAH to present facts and documentation in support of BAC's continued plea for program participation," but the request was denied. *See* CR.116 (¶¶104-05). The fact that Appellees did not recite the words "name-clearing" in their request is irrelevant.

*Fourth*, after depriving Appellees of the opportunity to rebut the TDA's stigmatizing allegations, the TDA sent the disqualification notice to the USDA, which, in turn, notified the world. *See* CR.120 (¶119). Appellants argue that the disclosure was involuntary because, upon finding a serious violation, TDA was obliged notify the USDA. App. Br. at 48. But the Fifth Circuit authority Appellants cite holds only that a voluntary act must cause the charges to be published. *See Arrington v. City of Dallas*, 970 F.2d 1441, 1447 n.4 (5th Cir. 1992). Here, all of Appellants' actions were voluntary such that the disclosure is "fairly attributable" to the TDA. *See Hughes v. City of Garland*, 204 F.3d 223, 227 (5th Cir. 2000); *cf. Roe v. Patterson*, 707 S.W.3d 94, 98 (Tex. 2025) ("a person who supplies defamatory material to another for publication can be liable for defamation").

For all these reasons, the district court properly denied Appellants' plea to the jurisdiction directed to the procedural due-course of law claim.

## C. Appellees' substantive due-course-of-law claim is facially valid.

"[S]ubstantive due process 'bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them.'" *Lakey v. Taylor*, 435 S.W.3d 309, 317 (Tex. App.—Austin 2014, no pet.) (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)). "'A violation of substantive due process occurs when the government deprives individuals of constitutionally protected rights by an arbitrary use of power.'" *In re J.R.*, 652 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2022, pet. denied) (quoting *Reynoso v. Dibs US, Inc.*, 541 S.W.3d 331, 338 (Tex. App.—Houston [14th Dist.] 2017, no pet.)); *Gatesco Q.M. Ltd. v. City of Hous.*, 503 S.W.3d 607, 618 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (government "violates Substantive Due Process if it exercises its power in an arbitrary and unreasonable way" (citing *City of San Antonio v. TPLP Office Park. Props.*, 218 S.W.3d 60, 64-65 (Tex. 2007)). Under the governing test, "[plaintiff] must show that it is not at least 'fairly debatable' that the [government's] action was rationally related to a legitimate governmental interest." *Id.*; *Reynoso*, 541 S.W.3d at 339 (same); *City of Richardson v. Bowman*, 555 S.W.3d 670, 691-92 (Tex. App.—Dallas 2018, pet. denied) (same). Appellees meet this test here.

While Appellants cite 1998 and 2007 authority to assert that arbitrary government actions must shock the conscience to violate the

federal due process clause, they admittedly cite no such authority for the *Texas* due course of law clause at issue in this case. *Compare* App. Br. at 50-51. That clause generates "at least some burden for protecting individual rights that the United States Supreme Court determined were not protected by the federal Constitution." *Patel v. Texas Dep't of Licensing & Reg.*, 469 S.W.3d 69, 98 (Tex. 2015). For example, a state law whose real-world effect is so burdensome as to be oppressive in light of the government's interest would violate Texas's substantive due course of law protections even if it would not violate the federal due process clause. *See id.* Given the number of published Texas appellate opinions applying the rational basis test to government actions under the substantive due course of law clause, *see supra*, Appellants have not shown that the test is inapplicable to Appellees' claim.

### 1. Appellees allege protected property and liberty interests.

For the reasons set forth *supra*, Argument, §§ IV.A, Appellees have alleged interests giving rise to substantive, as well as procedural, protections. While Appellants argue that a stigma-plus liberty interest only gives rise to a *procedural* due process claim, they cite no Texas or even Fifth Circuit authority. *See* App. Br. at 48, 50. And, although the Fifth Circuit has not squarely addressed this precise issue, it has charted a different course in practice. In *San Jacinto Savings & Loan v. Kacal*, for example, the plaintiff owned an arcade business that was shut down

39

by a campaign of police harassment. 928 F.2d 697, 703 (5th Cir. 1991). Applying the "stigma-plus infringement" test, the Fifth Circuit held that the plaintiff's protected liberty interest was violated. *Id.* at 702-04. As the Western District of Texas subsequently noted, "the holding of *Kacal* appears to be grounded on a substantive due process theory." *Doss v. Morris*, Civ. No. SA-11-CV-00116-DAE, 2013 WL 2147460, at *6 (W.D. Tex. 2013). Thus, in this Circuit—unlike the inapposite cases upon which Appellants rely—a stigma-plus liberty interest *can* support a substantive due process claim and *does* support such a claim on the facts Appellees have pleaded. *Compare, e.g., id.*

## 2. Appellees allege arbitrary conduct.

As discussed, *infra* at 42-43, Appellees allege that a suspect classification motivated Appellants' conduct. Even in the absence of a suspect classification, however, the allegations demonstrate a disconnect between Appellants' actions and any legitimate governmental interest. Based on the pleadings, the CAD Appellees submitted before their termination met every requirement the TDA had, to-date, articulated and "followed [TDA] guidance to a tee." CR.121 (¶123). Nevertheless, the TDA still terminated Appellees' participation in the CACFP, after the fact citing new hyper-specific and arbitrary requirements it had never disclosed during the months in which Appellees sought and requested such guidance. *See* CR.115 (¶¶100-01).

Appellants argue that the pleadings reveal "legitimate program violations at issue" and conduct that was rationally related to their interest in ensuring that the program's rules are followed. App. Br. at 48-50. But in their only cited example, Appellants note that the TDA issued a citation for BAC submitting "attendance and meal form counts [that] include[d] an entire calendar weeks' worth of meal service on a single form." *Id.* at 49. Appellants argue this violated a regulation requiring "[d]aily records indicating the number of participants in attendance and the daily meal counts." *Id.* (quoting 7 C.F.R. § 226.15(e)(4)). The regulation, however, does not require daily records to be maintained on separate forms, and neither does it prohibit daily records from being marked on a form containing seven days. 7 C.F.R. § 226.15(e). To put this in context, in the form at issue, the TDA did not allege that BAC had miscounted meals or participants or that it had delivered the services in an improper way. Instead, it claims to have terminated the Agreement and blacklisted BAC and its principals for seven years because BAC administrative combined more than one correct daily count onto a single form—hardly a reason to terminate a contract, withhold millions of dollars, and irreparably harm individuals and BAC for years.

Notably, the TDA ever raised concerns about this same meal-count form during any of the preceding eight years of BAC's CACFP participation. CR.109. Thus, nothing about the pleadings, which must

41

be construed "liberally in the pleaders' favor," *Houston Belt*, 487 S.W.3d at 160, suggests that the TDA's actions were in any way "rationally related to a legitimate governmental interest," *Gatesco Q.M. Ltd.*, 503 S.W.3d at 618. On their face, the pleading is sufficient to demonstrate jurisdiction, including for Appellees' substantive due-course-of-law claim.

### D. Appellees' equal protection claim is facially valid.

Appellees' equal protection claim is facially valid and is not barred by sovereign immunity. "[T]o assert an equal-rights claim under article I, section 3, a claimant must allege that it was treated differently from other similarly situated parties, without a reasonable basis." *City of Houston v. Downstream Env't., L.L.C.*, 444 S.W.3d 24, 38 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). Here, Appellees' pleading establishes both requisite elements.

#### 1. Appellees were treated differently in violation of the Equal Protection Clause.

As set forth in the petition, Appellants treated BAC differently based on the race and sex of BAC's senior leadership members. CR.127 (¶142). The pleading, in turn, is based on the following factual allegations: (1) other similarly situated entities engaged in similar conduct, but, upon investigation, were not found to have a serious deficiencies; (2) other similarly situated entities were allowed to cure deficiencies that, unlike BAC's CAD, the TDA accepted; and (3) other similarly situated entities were given far more guidance than BAC

regarding acceptable CADs before they were subjected to termination or disqualification decisions. CR.118 (¶112). BAC pleaded specific examples to back up these allegations, including that Appellant Lenss held BAC (and only BAC) to a "zero waste" standard that could not possibly apply to any participant in the CACFP network, thereby demonstrating the disparate treatment of BAC and its leaders based on pretext. CR.108 (¶80). Under governing authority, these allegations are sufficient to withstand Appellants' plea.

In *Texas Association of Business v. City of Austin,* for example, the City argued that an equal protection claim failed because the plaintiffs "'failed to plead allegations showing that the [challenged] Ordinance' [mandating paid sick leave] [was] not rationally related to a legitimate government purpose." 565 S.W.3d at 435. The Court disagreed, noting that the plaintiffs "asserted in their pleadings that 'the City has no governmental interest in mandating paid sick leave,' and . . . explained that, despite the City's 'findings,' none of the purported interests is legitimate as to the City. . . ." *Id.* "Construing the pleadings liberally in the [plaintiffs'] favor and looking toward their intent, [plaintiffs] alleged sufficient facts to affirmatively demonstrate the district court's jurisdiction." *Id.* Significantly, the Court did *not* require the plaintiffs to identify a specific comparator given their contention that the challenged policy lacked a rational relationship to any legitimate government purpose. *See id.*

43

Similarly, in *City of Houston v. Downstream Environmental, L.L.C,* the plaintiff alleged that it was "singled out . . . with disparate treatment that has no rational basis" and that the City had treated it differently than other (unspecified) customers. 444 S.W.3d at 38. "Construing its pleadings liberally, [the First Court] conclude[d] that [plaintiff's] allegations of arbitrary, capricious, irrational, and disparate treatment state a constitutional claim based upon an unequal application of the law without any reasonable basis." *Id.* at 38-39. "As such, the equal-rights claims are sufficient to survive a plea to the jurisdiction based solely on the pleadings." *Id.* at 39. Again, although the plaintiff did not identify specific comparators in the pleading, this omission did not result in the claim being barred. *See id.* at 38-39.

Here, Appellants' challenge should suffer a similar fate. While Appellants complain that Appellees failed to explain what they meant by "similar" conduct, App. Br. at 53, "'a dilatory plea does not authorize an inquiry so far into the substance of the claims presented that plaintiffs are required to put on their case simply to establish jurisdiction.'" *Downstream Env't,* 444 S.W.3d at 39 (quoting *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 554 (Tex. 2000)). As such, the Court should reject Appellants' attempt to impose a heightened pleading burden.[3] *See id.*;

---

[3] Appellants' complaints about a lack of specificity in the pleadings ring particularly hollow given the efforts they took to prevent Appellees from obtaining the information they now argue is needed. *See* CR.118 (¶111); CR.195-315.

*see also City of Houston v. 4 Families of Hobby, LLC*, 702 S.W.3d 698, 721 (Tex. App.—Houston [1st Dist.] 2024, pet. filed) (holding that similar allegations were sufficient to overcome a plea to the jurisdiction on an equal protection claim).

Appellants also complain that the pleadings do not specifically allege that the same decision-makers were involved in the comparator decisions. App. Br. at 54. But again, the standard is whether Appellees' claims are facially valid, which Appellees have met. At a minimum, this is a curable defect for which Appellees should be afforded an opportunity to amend, not a basis for the dismissal Appellants seek.

## 2. Appellants had no reasonable basis for their actions.

To demonstrate reasonableness, Appellants rely on two decisions from the Courts of Appeals, neither of which bears the weight of Appellants' argument. *See* App. Br. at 54-56. In *Rivera v. Sonnenschein*, the Third Court held that the plaintiff—a woman who sued the Texas Board of Law Examiners after the Board denied her request for admission because she did not have a J.D. from an ABA-approved law school—had "not allege[d] facts showing that she was similarly situated to other applicants *or that the Board Members treated her differently without a reasonable basis*." No. 03-21-00516-CV, 2022 WL 1751685, at *1, *6 (Tex. App.—Austin 2023, pet. denied) (emphasis added). Because her pleadings did not demonstrate incurable jurisdictional defects, the

45

Third Court remanded the claim to afford the plaintiff an opportunity to amend. *Id.* at *6. Here, by comparison, Appellees have alleged that Appellants treated them differently from similarly situated CACFP and SFSP participants *without a reasonable basis* and included more facts to support their disparate treatment claim than the plaintiff in *Rivera.*

The same is true of *City of Floresville v. Starnes Inv. Group, LLC*, a case in which the Fourth Court rejected a plaintiff's equal protection claim where the pleading failed to describe "the nature of the different treatment" at issue. 502 S.W.3d 859, 868 (Tex. App.—San Antonio 2016, no pet.). Here, by contrast, Appellees allege specific facts regarding their differential treatment by identifying *specific* ways BAC was treated differently than otherwise similarly-situated comparators, including with respect to the TDA's serious deficiency determinations, its rejection of BAC's CADs, and the notice the TDA provided regarding its expectations for those CADs in advance of any adverse determination. CR.118 (¶¶112-13). The pleadings also identify a specific statement made by an influential TDA official that demonstrated that BAC was held to a different standard than any other program participant. CR.108 (¶80). On the basis of these allegations alone, the equal protection claim is facially valid.

### 3. *Engquist* does not foreclose Appellees' alternatively-pleaded class-of-one equal protection claim.

Appellees also allege, in the alternative, that "even if no protected category was involved, [Appellants'] actions would still violate Equal Protection guarantees because they were irrational and arbitrary." CR.127 (¶143). Appellants argue that the Supreme Court has foreclosed a "class-of-one" theory, applying caselaw that is vastly different than the facts presented here. *See* App. Br. at 56-57.

In *Engquist v. Oregon Department of Agriculture*, a government employee brought an equal protection claim, contending that her employer terminated her employment for arbitrary reasons unrelated to any protected category. 553 U.S. 591, 595 (2008). The Supreme Court noted that government employees are needed to perform the tasks of government and that government offices could not function if every employment decision became a constitutional matter. *Id.* 598-99. On these facts, the Court concluded that "[t]here are some forms of state action[,] which by their nature involve discretionary decision-making based on a vast array of subjective, individualized assessments." *Id.* at 601-03. "In such cases the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted." *Id.* at 603. The Court thus declined to "repudiat[e]" "the concept of at-will

employment" by recognizing a class-of-one equal protection claim in the context of public employment. *Id.* at 606-07.

BAC is not a governmental employee, and this case has nothing to do with public employment. Indeed, a government agency has far more discretion in managing its at-will workforce than does a state agency, like the TDA, charged with administering a program like the CACFP, where its actions and decisions are cabined by a host of regulations. *See* CF.94-99 (¶¶33-51); 2.RR.87:21-88:1. Moreover, unlike the facts in *Engquist*, the TDA did not retain Appellees to perform a service *for* the TDA; rather, Appellees accepted funds from the TDA to serve the public. CR.100, 105-06 (¶¶56, 72). These facts do not lend themselves to an extension of *Engquist*, whereby the word "employee" may be replaced with "independent contractor." Given the lack of precedential authority—or even non-precedential authority—within the Fifth Circuit, this Court should decline the invitation to extend *Engquist*'s holding to the facts of this case.

### E. The redundant remedies doctrine does not bar any of Appellees' otherwise facially-valid claims.

Appellants ask the Court to "find that the redundant remedies doctrine bars counts 1-3 of [the] amended petition." App. Br. at 58. "Under the redundant remedies doctrine, courts will not entertain an action brought under the UDJA when the same claim could be pursued through different channels." *Patel*, 469 S.W.3d at 79. In *Patel*, for

example, the plaintiffs brought a due process challenge to Texas's licensing regulations for eyebrow threading under the UDJA, alleging that the regulations violated Texas's due-course-of-law provision. *Id.* at 73, 76. The Court rejected the State's attempt to dismiss the case based on the "redundant remedies doctrine," finding that the relief plaintiffs sought went beyond reversal of the particular orders at issue. *Id.* at 74-75. The same conclusion applies here.

A successful suit for judicial review under the APA only entitles the appealing party to reversal of the agency's decision or remand for further proceedings. TEX. GOV'T CODE § 2001.174. "The available remedies on appeal from an administrative finding are limited to reversal of the particular orders at issue." *Patel*, 469 S.W.3d at 79. As such, the district court is *not* authorized to declare the order void or issue injunctive relief. *See id.*; *Tex. State Bd. of Pharmacy v. Steely*, 764 S.W.2d 806, 815 (Tex. App.—Austin 1988, writ denied) (district court had no authority to declare "the Board's orders 'null and void'" or "enjoin[] permanently their enforcement" despite concluding that "the district court properly reversed the Board's final order").

Consistent with this limitation, Appellees invoke the APA to ask the district court only to reverse TDA's termination and disqualification order. CR.133 (¶177). By contrast, in Counts 1-3 (claims for violations of the Texas Constitution), Appellees ask the district court to go much further and declare void "(1) TDA's finding that BAC had 'serious

deficiencies' in its administration of the CACFP under its Permanent Agreement with TDA, (2) TDA's rejection of BAC's CADs[,] and (3) TDA's decision to terminate BAC's Agreement and disqualify Plaintiffs from future CACFP participation." CR.122 (¶127). Appellees also ask the district court to issue prospective injunctive relief requiring Appellants to remove Appellees from the National Disqualification List, restore BAC's eligibility to receive CACFP and SFSP payments, and issue equitable relief designed to restore Appellees to the position they occupied before Appellants' unlawful actions. CR.122-23, 128 (¶¶128, 145). These remedies do not duplicate the far more limited relief Appellees seek pursuant to the APA. *Cf. Van Boven v. Freshour*, 659 S.W.3d 396, 400-01, 404-05 (Tex. 2022) (board's filing of a revised report indicating that the plaintiff's medical license was no longer restricted was not the same as filing a void report, which would require withdrawing the initial report in its entirety); *In re Garza*, 126 S.W.3d 268, 271 (Tex. App.—San Antonio 2003, mandamus denied) ("A void order has no force or effect and confers no rights; it is a mere nullity.").

Finally, even if this Court were to accept Appellants' redundant-remedies argument, it would not warrant dismissal. "An injunction is an equitable remedy, not a cause of action." *Brittingham v. Ayala*, 995 S.W.2d 199, 201 (Tex. App.—San Antonio 1999, pet. denied). Similarly, while the UDJA is "sometimes termed a 'cause of action' colloquially," the declaratory relief it authorizes "is more precisely a type of *remedy* that

50

may be obtained with respect to a cause of action or other substantive right." *Craig v. Tejas Promotions, LLC*, 550 S.W.3d 287, 297-98 (Tex. App.—Austin 2018, pet. denied) (emphasis in original). Here, the "cause of action or other substantive right" Appellees invoke seek to redress violations of procedural due course of law, substantive due course of law, and equal protection under the Texas Constitution. *Compare, e.g., City of Elsa,* 226 S.W.3d at 392; *Tex. Dep't of Public Safety v. Martin*, 882 S.W.2d 476, 482 (Tex. App.—Beaumont 1994, no writ). Thus, even if Appellees' UDJA-based request for declaratory judgment was dismissed, that ruling would not affect Appellees' claims for injunctive relief under these other causes of action.

## F.    Appellees' *ultra vires* claim is facially valid.

Seeking to obtain dismissal of Appellees' *ultra vires* claim, Appellants do nothing more than cross-reference their arguments for immunity. App. Br. at 58. For the reasons set forth *supra*, Argument, § I, those arguments are baseless and provide Appellants with no reasonable basis to contest the facial validity of Appellants' as-pleaded *ultra vires* claim. Having failed to mount a jurisdictional basis to dismiss that claim, the district court's order should be affirmed.

## G.    Appellees' takings claim is facially valid.

To prevail on a takings claim, a plaintiff must show "(1) the government engaged in affirmative conduct (2) that proximately caused (3) the taking, damaging, destroying, or applying (4) of specific private

property (5) for a public use (6) without paying the owner adequate compensation (7) and did so intentionally or with knowledge that the result was substantially certain to occur." *Commons of Lake Hous., Ltd. v. City of Hous.*, 711 S.W.3d 666, 676 (Tex. 2025). A regulatory taking occurs when the regulation's application "(1) requires an owner to suffer a permanent physical loss or invasion of its property [], (2) completely deprives an owner of all economically beneficial use of its property [], or (3) unreasonably interferes with the owner's right to use and enjoy its property (often called a *Penn Central* taking)." *Id.* at 677 "Identifying a *Penn Central* taking, however, requires the court to engage in an 'ad hoc' and 'situation-specific' factual inquiry, weighing multiple factors including (1) the regulation's economic impact on the owner, (2) the extent to which the regulation interferes with the owner's reasonable investment-backed expectations, and (3) the character of the government action." *Id.* at 677-68.

As discussed above, in *Texas Telephone Association*, the Third Court upheld a "takings" claim under very similar circumstances. 653 S.W.3d at 237. Applying the *Penn Central* factors, the Court found that the PUC's funding withdrawal had a dramatic economic impact on the affected providers who never would have invested in rural telecommunications infrastructure and services had they known PUC would pull funding for those services. *Id.* at 269-70. In addition, the Court determined that the PUC had "made a decision, made a plan to

52

implement that decision, and executed that plan," thereby taking "affirmative act[s] . . . they knew would result in underpayment." *Id.* Finding these allegations sufficient to demonstrate a facially-valid taking, the Third Court reversed the district court's plea order and remanded the claim for an assessment of monetary damages. *Id.* at 272.

Similar to *Texas Telephone Association*, Appellees participated in government-funded programs that the TDA was charged with administering. The TDA took actions to terminate and disqualify Appellees from participating in these programs, resulting in Appellees' loss of millions of dollars in promised funding. *See* CR.103, 117, 134, 141 (¶¶65, 108, 181, 209). Relying on the promised funding, and with the TDA's full knowledge, BAC invested significant resources in its workforce (expanding from a few hundred to over 1,000 employees), its physical infrastructure (opening offices across greater Texas), and its software. CR.100-03, 117 (¶¶57-65, 108). When Appellants acted to strip BAC of that funding or any ability to participate in the CACFP, SFSP, or *any* federally-funded food program, they plainly knew the decision would generate a significant loss.

Seeking to avoid the reach of cases like *Texas Telephone Association*, Appellants first assert that Appellees lacked a vested property interest to support a takings claim. *See* App. Br. at 59. As discussed, *supra,* Argument, §IV.A(1), that is factually incorrect, and also flies in the face of *Texas Telephone Association*, which held that contract-

53

based funding, in fact, does provide a vested property interest. *See* 653 S.W.3d at 269 (identifying the property interest as the "depriv[ation]" of "millions of dollars" in "monthly support"). Here, too, Appellees were deprived of millions of dollars in contractual support. "The money in question is, in essence, [BAC's] property." *Tex. Workforce Comm'n v. Midfirst Bank*, 40 S.W.3d 690, 698 (Tex. App.—Austin 2001, pet. denied). While Appellants did not possess Appellees' physical property, it is well established that property "is the bundle of rights that describe one's relationship to a thing and not the thing itself." *Jim Olive Photography v. Univ. of Houston Sys.*, 624 S.W.3d 764, 774 (Tex. 2021).

Next, Appellants contend "'[w]hen the government acts pursuant to colorable contract rights, it lacks the necessary intent to take under its eminent-domain powers.'" App. Br. at 59 (quoting *State v. Holland*, 221 S.W.3d 639, 643 (Tex. 2007)). Underlying *Holland*, however, is the recognition that "the State wears two hats: the State as a party to the contract and the State as a sovereign." *Gen. Servs. Comm'n v. Little-Tex. Insulation Co., Inc.*, 39 S.W.3d 591, 599 (Tex. 2001) (superseded by statute on other grounds). "The State, in acting within a color of right to take or withhold property in a contractual situation, is acting akin to a private citizen and not under any sovereign powers." *Id.*

Here, as part of Congress's intent to "safeguard the health and well-being of the Nation's children and to encourage the domestic consumption of nutritious agricultural commodities and other food," it authorized

54

grants-in-aid to the States. *See* 42 U.S.C. § 1751. To further this objective, Congress authorized the creation of the CACFP and charged state agencies—here, the TDA—with administering it. *Id.* at § 1766(a)(ii). In administering and disbursing appropriate funds via the CACFP, the TDA wears its hat as sovereign, even if effectuates that mandate by entering into contracts. *See id.* at § 1766(d)-(g); 7 C.F.R. § 226.6. Thus, when the TDA acted to terminate and disqualify Appellees' participation in the CACFP, it retained that sovereign hat and cannot now claim that it lacked the necessary intent to take those actions pursuant to the powers of eminent-domain. *Compare* App. Br. at 59.

Appellants also argue that Appellees were obliged to identify a public use to which the withheld funds would have been put. *See* App. Br. at 40-41. This, too, is inconsistent with governing authority. In *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, for example, the Supreme Court concluded that a taking had occurred when a county court claimed the interest that had accrued on an interpleader fund deposited in the registry of the court as its own. 449 U.S. 155, 155-56 (1980). The Court concluded that the government lacked a justification for retaining the interest, emphasizing that "[n]o police power justification [was] offered for the deprivation." *Id.* at 162-64. Far from rejecting the claim for lack of an alleged public use, however, the Court concluded that the government's actions were "the very kind of thing that the Taking Clause . . . was meant to prevent." *Id.* at 164.

55

Similarly, in *Midfirst Bank*, the Texas Workforce Commission ("TWC") used money it had acquired from a delinquent debtor to pay off wage claims and unemployment taxes of the debtors' former employees. 40 S.W.3d at 692-94. A creditor with a perfected legal interest in the same funds brought a takings claim against the TWC. *Id.* While the TWC argued that no taking occurred because "its actions in recovering the funds for wage claims were not in furtherance of a public purpose," the Third Court disagreed. *Id.* at 696 ("The fact that the benefit inures to a specific group of people does not lessen the importance of enforcement of the labor code to the public at large."). Here, as with the TWC, the TDA's administration of the CACFP fulfills and furthers a public purpose—the provision of meals to those in need.

Finally, Appellants suggest that allowing Appellees' taking claim to stand would open the floodgates for every terminated CACFP participant to also raise a takings claim that the TDA would then have to defend. *See* App. Br. at 61-62. But the jurisprudence applying *Penn Central* is not so broad. Instead, the requisite analysis "is characterized by 'essentially ad hoc, factual inquiries,' designed to allow careful examination and weighing of all the relevant circumstances'" for the particular case. *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002). Here, the specific circumstances regarding the economic impact and extent to which the TDA interfered with BAC's distinct investment-backed expectations are unusual, if not

entirely unique, given the TDA's failure to follow its own guidelines and regulations before effectuating the taking at issue. *See Tex. Tel. Ass'n*, 653 S.W.3d at 269.

Pursuant to its authority to administer a federal funding program, the TDA deprived BAC of funds to which it otherwise was legally entitled and interfered with investment-backed expectations in the process. At this stage, Appellees' burden to demonstrate the district court's subject-matter jurisdiction is merely to bring a "properly pled takings claim." *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476 (Tex. 2012). As shown by the Third Court's holdings in *Texas Telephone Association* and *Midfirst Bank*, the pleadings here are more than sufficient to establish the Court's subject-matter jurisdiction over the takings claim, and Appellants' plea should remain rejected.

## PRAYER

For the reasons set forth herein, Appellees Be a Champion, Inc., James Hong, Kevin Klotz, George Moon, and Jaron Bargainer respectfully ask the Court to affirm the district court's order denying the amended plea to the jurisdiction. Appellees further request any other relief, whether in law or in equity, to which the Court may find them justly entitled.

57

Respectfully submitted,

**TERRAZAS PLLC**
1001 S. Capital of Texas Hwy.
Bldg. L, Suite 250
Austin, Texas 78746
512.680.3257

By:   /s/ *Kevin J. Terrazas*
        Kevin J. Terrazas
        State Bar No. 24060708
        kterrazas@terrazaspllc.com
        Benjamin L. Dower
        State Bar No. 24082931
        bdower@terrazaspllc.com
        Jennifer A. Foster
        State Bar No. 24104938
        jfoster@terrazaspllc.com

**ATTORNEYS FOR APPELLEES**

## CERTIFICATE OF COMPLIANCE

As required by Rule 9.4(i)(3) of the Texas Rules of Appellate Procedure, I certify that the foregoing Appellants' Brief contains 13,239 words, excluding the parts of the document exempted by Rule 9.4(i)(1), fewer than the 15,000-word maximum. I relied on the word count of Microsoft Word, the computer program used to prepare the document, in completing this certificate.

/s/ *Benjamin L. Dower*
Benjamin L. Dower

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of August 2025, a true and correct copy of the foregoing was filed electronically, and notice of this filing will be sent to all parties by operation of the Court's electronic filing system, including counsel for Appellants.

/s/ *Benjamin L. Dower*
Benjamin L. Dower

| DATE | EVENT | CITE |
|---|---|---|
| 2001 | • Appellees Jaron K. Barganier and James Hong create Be A Champion, Inc. ("BAC"), with mission of "us[ing] sports, education, and nutrition programs to enhance the development of youth. . . ." | CR.99-100 (¶¶ 52, 54) |
| 2013 | • BAC introduces Fuel Food Programs to program partners and serves more than 40,000 snacks/ suppers to eligible program participants each day. | CR.100 (¶ 56) |
| 2014 | • BAC enters into Permanent Agreement with Texas Department of Agriculture ("TDA") to participate in Federal Child and Adult Care Food Program ("CACFP") and Summer Food Service Program ("SFSP"). Under Agreement, BAC acts as independent childcare center providing meals and snacks to at-risk youth. | CR.100 (¶ 57) |
| 2015–22 | • BAC expands operations, employing more than 1,000 employees.<br><br>• TDA conducts eleven administrative reviews of BAC's operations without ever issuing serious deficiency finding | CR.101-03 (¶¶58–65) |
| Feb.–May 2022 | • TDA conducts administrative review of BAC's CACFP participation. The 6 TDA employees who conduct review find no serious deficiencies.<br><br>• Despite that determination, then-TDA employee Carey Spence Lenss instructs other TDA employees to target BAC and issue serious deficiency findings based on minor issues such as a *single* meal not being counted, a *single* meal being inadvertently added to meal records, or a misunderstanding as to when a school day ended (normal school hours versus end of academic instruction).<br><br>• In exit conference, Lenss states other contracting entities have zero food waste and that *any* food waste constitutes serious deficiency (both untrue). | CR.102, 107-09 (¶¶63, 78–84) |

| DATE | EVENT | CITE |
|------|-------|------|
| May–Nov. 2022 | • TDA conducts CACFP management review, wherein individual capacity Appellants apply disparate standards to BAC. | CR.109 (¶85) |
| Sept. 2022 | • TDA initiates administrative review of BAC's participation in SFSP. Initial report contains no serious deficiency findings.<br><br>• Again, Lenss instructs TDA employees to target BAC and issue serious deficiency findings. | CR.103 (¶66) |
| Nov. 2022 | • TDA presents altered SFSP preliminary report with proposed serious deficiency findings inconsistent with TDA's past practices and regulatory standards.<br><br>• TDA issues CACFP serious deficiency determination and requires corrective action document ("CAD") but fails to specify corrective actions as required by CACFP Handbook and agency regulations. | CR.103-04, 105-06, 110-11 (¶¶66–68, 72, 86–89) |
| Dec. 2022 | • BAC submits proposed CAD that exhaustively addresses every deficiency TDA identified with respect to CACFP. | CR.111-12 (¶¶90–92) |
| April 2023 | • BAC submits renewal application for SFSP.<br><br>• TDA rejects application citing "open" serious deficiency finding—*despite no finding*—resulting in loss of funding and 130,000 summer meals going unserved. | CR.104-05 (¶69) |
| May 2023 | • After waiting 6 months, TDA notifies BAC that CAD has been rejected and gives BAC 13 days to submit corrected documents. TDA provides no notice regarding why prior CAD rejected.<br><br>• BAC submits 307-page CACFP CAD to address every conceivable deficiency and requests meeting with TDA officials to understand TDA's expectations. | CR.112-14 (¶¶93–96) |
| July 2023 | • TDA belatedly issues notice of serious deficiency regarding SFSP participation.<br><br>• In response, BAC submits CADs completely addressing TDA's SFSP serious deficiency findings. | CR.105, 113-14 (¶¶70–71, 96) |

| DATE | EVENT | CITE |
|------|-------|------|
| | • BAC leadership also meets with TDA officials to discuss CACFP CAD, but TDA provides no explanation regarding TDA expectations. | |
| August 2023 | • BAC submits revised CADs, expanding detail from 307 to 410 pages (without supporting documents). | CR.114 (¶97) |
| October 2023 | • TDA sends BAC notice of termination and exclusion regarding SFSP, falsely stating that BAC had failed to demonstrate corrective actions that would address each purported deficiency.<br><br>• In resulting hearing, administrative review officer ("ARO") concludes TDA failed to comply with federal rules by terminating BAC's SFSP participation.<br><br>• Final Order reverses TDA's SFSP termination.<br><br>* * * *<br><br>• TDA sends BAC notice of termination and exclusion regarding CACFP that attaches a 21-page CAD assessment that—*for the first time*—provides notice of TDA's expectations for the CAD.<br><br>• BAC's CACFP and SFSP participation terminated and excluded from "perform[ing] any Child Nutrition Program function, participat[ing] as a daycare home provider, or serv[ing] as a principal in any organization or site in the Child Nutrition Programs." | CR.105-07, 113-16 (¶¶72–76, 96–102) |
| December 2023 | • BAC appeals termination/exclusion decision and requests formal hearing before ALJ at SOAH.<br><br>• BAC proceeds with hearing before ARO employed by TDA. BAC not allowed to challenge serious deficiency determination or rejection of CAD.<br><br>• Without considering merits, ARO issues final order affirming TDA's termination decision.<br><br>• BAC forced to reduce workforce by ~600 people and cease operations. | CR.116-17 (¶¶103–08) |
| 2022–23 | • Appellees submit PIA requests on TDA's treatment of other entities. TDA withholds all information. | CR.118 (¶111) |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Benjamin Dower on behalf of Benjamin Dower
Bar No. 24082931
bdower@terrazaspllc.com
Envelope ID: 104825920
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Appellees' Brief on the Merits and Appendix
Status as of 8/26/2025 7:15 AM CST

Associated Case Party: Texas Department of Agriculture

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Thomas Ray | | thomas.ray@oag.texas.gov | 8/25/2025 5:39:24 PM | SENT |
| Todd Dickerson | | todd.dickerson@oag.texas.gov | 8/25/2025 5:39:24 PM | SENT |

Associated Case Party: Be a Champion, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Kevin Terrazas | 24060708 | kterrazas@terrazaspllc.com | 8/25/2025 5:39:24 PM | SENT |
| Benjamin Dower | 24082931 | bdower@terrazaspllc.com | 8/25/2025 5:39:24 PM | SENT |
| Jennifer Foster | 24104938 | jfoster@terrazaspllc.com | 8/25/2025 5:39:24 PM | SENT |